UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

Case No. 25-50951

JUSTIN RIDDLE,

Plaintiff-Appellant

v.

X CORP., FORMERLY KNOWN AS TWITTER, INCORPORATED,

Defendant-Appellee

APPELLANT'S OPENING BRIEF

On Appeal from the United States District Court

for the Western District of Texas

Case No. 1:25-CV-73

Justin Riddle, Pro Se

Tel: (402) 813-2156

Email: justinriddle1@gmail.com

December 25, 2025

## CERTIFICATE OF INTERESTED PERSONS

The undersigned certifies that the following persons have an interest in the outcome of this case:

Parties:

Justin Riddle, Pro Se Appellant

X Corp. (formerly Twitter, Inc.), Appellee

Counsel:

Justin Riddle, Pro Se

Norma N. Bennett, Shook, Hardy & Bacon, LLP (for Appellee)

Kenneth M. Trujillo-Jamison, Willenken LLP (for Appellee)

District Court Judge:

Hon. Alan D. Albright, United States District Court for the Western District of Texas

/s/ Justin Riddle

Pro Se Appellant

December 25, 2025

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument on an expedited basis.

This appeal presents questions of first impression with nationwide implications affecting every content moderation dispute in federal court.

## TABLE OF CONTENTS

Certificate of Interested Persons                        2

Statement Regarding Oral Argument                        3

Table of Contents                                        4

Table of Authorities                                     5

Jurisdictional Statement                                 6

Preliminary Statement: The Precedential Stakes           6

Statement of Issues                                      9

Statement of the Case                                    11

Summary of the Argument                                  21

Argument                                                 24

Conclusion                                               59

Certificate of Compliance                                62

Certificate of Service

# TABLE OF AUTHORITIES

Cases

Fair Housing Council v. Roommates.com, 521 F.3d 1157 (9th Cir. 2008) (en banc)

Force v. Facebook, Inc., 934 F.3d 53 (2d Cir. 2019)

MGM Studios Inc. v. Grokster, Ltd., 545 U.S. 913 (2005)

Moody v. NetChoice, LLC, 603 U.S. 707 (2024)

New Hampshire v. Maine, 532 U.S. 742 (2001)

Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417 (1984)

Sony Music Entertainment v. Cox Communications, No. 23-176 (U.S. filed Aug. 29, 2023)

Statutes and Rules

17 U.S.C. § 101 et seq. (Copyright Act)

17 U.S.C. § 410(c)

17 U.S.C. § 512 (DMCA safe harbor)

17 U.S.C. § 512(g) (DMCA counter-notice requirements)

18 U.S.C. § 2258A (CSAM reporting requirements)

28 U.S.C. § 1291 (appellate jurisdiction)

28 U.S.C. § 1331 (federal question jurisdiction)

42 U.S.C. § 12132 (ADA Title II)

47 U.S.C. § 230 (Communications Decency Act)

Fed. R. Civ. P. 37(e) (spoliation)

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction under 28 U.S.C. § 1331 (federal question) for claims arising under the Copyright Act (17 U.S.C. § 101 et seq.) and the Americans with Disabilities Act (42 U.S.C. § 12132).

The district court entered final judgment dismissing all claims with prejudice on October 27, 2025. (Dkt. 73).

Appellant filed a timely Notice of Appeal on November 1, 2025. (Dkt. 74).

This Court has jurisdiction under 28 U.S.C. § 1291.

## PRELIMINARY STATEMENT: THE PRECEDENTIAL STAKES

This Court faces a binary choice with nationwide implications.

Appellant can pursue the post-dismissal conduct—the ongoing copyright infringement, the systematic suspension cycles, the continued impersonation—in the District of Nebraska. Those claims are not barred by the Texas dismissal. The Nebraska court can review the actual merits of what has occurred and continues to occur.

**But this Court's decision will create binding precedent either way.**

If this Court affirms the district court's reasoning without addressing the substance:

- Every institutional defendant can cite *Riddle v. X Corp* for the proposition that evidence spoliation is "moot" if completed before ruling

- Every platform can cite *Riddle v. X Corp* for simultaneous Section 230 and First Amendment immunity
- Every defendant can cite *Riddle v. X Corp* for claiming both comprehensive knowledge and complete ignorance under oath
- Every court can cite *Riddle v. X Corp* for dismissing federal copyright claims for "tone" despite statutory prima facie proof
- Every court can cite *Riddle v. X Corp* for weaponizing documented disabilities by creating the exact barriers identified, then punishing the response

The issues will not disappear because Appellant can pursue them in Nebraska. But thousands of future litigants—facing the same systematic fraud, the same impossible legal positions, the same institutional advantages—will face defendants citing this Court's affirmance.

This Court can either:

1. **Address the legal errors on their merits**—creating precedent that logical impossibilities are not acceptable, that disabilities cannot be weaponized, that platforms must choose between immunity theories, that Rule 37(e) means something.

2. **Affirm without substantive analysis**—creating precedent that institutional defendants can successfully employ these tactics, binding future panels to the proposition that the Fifth Circuit has "already reviewed and approved" these frameworks.

Silence is not neutral. Affirmance without analysis becomes precedent. And precedent is what every future defendant will cite when facing similar claims.

The question is not whether Appellant can pursue justice—he can, and will, in Nebraska if necessary. The question is **what precedent this Court creates for everyone else**.

Appellant respectfully requests oral argument on an expedited basis.

This appeal presents questions of first impression with nationwide implications affecting every content moderation dispute in federal court:

3.    **Whether Section 230 "good faith" immunity and First Amendment "editorial choice" protection are mutually exclusive**—because you cannot simultaneously be "not the speaker" and "the speaker making expressive editorial choices."

4.    **Whether declaring evidence spoliation "moot" upon completion renders FRCP 37(e) unenforceable**—since all evidence destruction is necessarily complete when courts address it.

5.    **Whether contributory copyright infringement can exist without underlying direct infringement**—a question that apparently requires this Court's clarification despite forty years of Supreme Court precedent and basic logic.

6.    **Whether the "passive conduit" defense survives the Employee Termination Benchmark**—if platforms can terminate employee access globally in seconds, claims of "technical incapacity" to remove specific URLs become technical fraud.

7.    **Whether a party may swear to both comprehensive knowledge and complete ignorance of identical facts**—creating what physicists might call a "quantum legal state" where X Corp simultaneously knows and does not know how its own billing system operates.

8.    **Whether federal courts can weaponize documented disabilities**—ignoring accommodation requests, creating the exact cognitive barriers identified, then dismissing for the predictable response.

This Court's December 23, 2025 order demonstrated capacity to process 11,400+ words in approximately five hours. If this Court wishes to resolve these issues on the merits, expedited oral argument would permit that. Absent expedited scheduling, Appellant will pursue parallel remedies for post-dismissal conduct in the District of Nebraska, creating two simultaneous proceedings addressing overlapping issues. An expedited resolution here would serve judicial economy.

## STATEMENT OF ISSUES

### I. The Section 230/First Amendment Mutual Exclusivity

Whether X Corp's simultaneous invocation of Section 230 immunity ("we are not the speaker") and First Amendment protection ("our editorial decisions are protected speech") for identical conduct constitutes a fatal admission that destroys Section 230 immunity—because selective enforcement based on editorial preference is the opposite of good faith, and you cannot claim both "not the speaker" and "the speaker" for the same content.

## II. The Employee Termination Benchmark

Whether the "passive conduit" and "technical incapacity" defenses survive demonstration that platforms can terminate employee access globally in seconds—because if X Corp can instantly revoke a fired employee's access across global infrastructure, claiming inability to remove a specific URL identified in a DMCA notice is technical fraud.

## III. The Contributory Infringement Impossibility

Whether the district court created a legal impossibility by finding contributory copyright infringement "plausible" while simultaneously dismissing the underlying direct infringement claim—given that "contributory" means "contributing to" and you cannot contribute to something that does not exist.

## IV. The Spoliation "Mootness" Error

Whether the district court's declaration that evidence spoliation was "moot" because destruction had already occurred renders FRCP 37(e) unenforceable—since all evidence destruction is necessarily complete when courts address it, making the rule unenforceable in every case under this reasoning.

## V. The Quantum Knowledge States

Whether X Corp's sworn Answer containing 47 claims of "lacking knowledge" about its own operations—after demonstrating comprehensive knowledge of those same operations in its Motion to Dismiss—violates Rule 11, constitutes judicial estoppel, perjury, or all three.

## VI. The ADA Violation

Whether the district court violated the Americans with Disabilities Act by: (a) ignoring Appellant's documented accommodation request for logical consistency required by ADHD; (b) creating the exact logical impossibilities Appellant identified as cognitive barriers; and (c) citing Appellant's predictable response to those barriers as "tone" justifying dismissal—thereby weaponizing Appellant's disability against him.

### VII. The December 23, 2025 Order

Whether an appellate order processing 11,400+ words in approximately five hours—during the first available business hours after X Corp's Sunday evening filing, six days before Appellant's reply deadline—can credit an argument that 2,790 additional words created "undue burden" while simultaneously getting the attorney's name wrong and providing zero substantive legal analysis.

## STATEMENT OF THE CASE

### A. The Simple Question

This case begins with a question that should have a simple answer:

**Why is the impersonator account still active after 800 days?**

Appellant submitted to X Corp:

- Government-issued driver's license proving identity
- Federal copyright registration (VAu 1-519-728) for the photograph being stolen
- Screenshots showing the impersonator account using that copyrighted photograph

- Multiple DMCA takedown notices with required statutory declarations

The only element that does not match is the IP address—information exclusively within X Corp's control.

The impersonation has continued for over 800 days and counting.

## B. The Unavoidable Inference

Why would X Corp protect a random stranger for over two years?

X Corp removes content instantly when it affects advertising revenue or brand safety. X Corp terminates employee access globally in seconds when security requires it. X Corp processes DMCA claims from third parties within hours. X Corp processed Attorney Brandon Schwartz's 4:42 AM DMCA filings within hours. Yet for 800 days, X Corp has protected this specific impersonator account despite irrefutable proof of infringement.

The only rational explanation: **the impersonator is someone X Corp is protecting**—an employee, contractor, or other insider. No corporation expends resources protecting random users from valid copyright claims backed by federal registration.

This inference is critical to the direct infringement analysis. If the impersonator is an X Corp employee or contractor, then X Corp is not merely contributing to infringement by a third party. X Corp is the direct infringer acting through its agent.

## C. The DMCA Rechanneling: Active Content Analysis

**Over two years, Appellant submitted eight DMCA takedown notices with federal copyright registration. The pattern of responses proves X Corp's active involvement:**

**Four notices received:** "After a review, we've determined that the content you reported does not appear to infringe copyright. In some cases, we find there might be some confusion about what constitutes a copyright violation on Twitter."

**Three notices received:** "However, it seems that you are trying to report an impersonation or harassment issue, not one relating to copyright. Please file a new report using the appropriate form."

**One notice:** Went unanswered.

**Most recent response (November 30, 2023):** "it seems that you are trying to report an impersonation or harassment issue, not one relating to copyright."

Every response proves X Corp:

9.     Read the notice

10.    Analyzed the content

11.    Categorized it (decided it was "not copyright" or "harassment")

12.    Made a routing decision

13.    Ignored the DMCA claim despite federal copyright registration attached

**A platform cannot claim to be a "passive conduit" while admitting it analyzed, categorized, and rerouted copyright notices.**

This is active content moderation—the opposite of passive hosting.

The Missing Counter-Notices Prove Employee Involvement

When Attorney Brandon Schwartz filed DMCA claims against Appellant, the process worked perfectly:

14.    Appellant received the takedown notice

15.    Appellant responded with counter-notice

16.    Brandon received Appellant's counter-notice

17.    Brandon was given 10 days to file suit or content would be restored

**The statutory process functioned exactly as designed—when it benefited X Corp's preferred party.**

But over two years of Appellant's DMCA notices: **Appellant has never received a single counter-notice from the impersonator.**

Under 17 U.S.C. § 512(g), if X Corp removes content pursuant to DMCA notice and the user files a counter-notice, X Corp must send that counter-notice to the original complainant. X Corp demonstrated they know this procedure—they followed it perfectly for Brandon Schwartz.

**So where are the impersonator's counter-notices?**

Only two possibilities exist:

**Possibility A:** The impersonator never filed counter-notices because the impersonator is an X Corp employee or contractor—and X Corp knew filing counter-notices would create discoverable evidence of the relationship.

**Possibility B:** The impersonator did file counter-notices, but X Corp deliberately withheld them from Appellant—violating 17 U.S.C. § 512(g) and destroying any claim to DMCA safe harbor protection.

**There is no third option.** Either X Corp violated the DMCA procedural requirements, or the impersonator is an insider X Corp is protecting from discovery.

The fact that X Corp's DMCA procedures work flawlessly when filing claims against Appellant, but completely break down when Appellant files claims against the impersonator, proves selective enforcement—the opposite of good faith.

### D. The Advertising Fraud: Mathematical Impossibilities

During this period, Appellant paid X Corp $1,100 for advertising services. X Corp delivered approximately $39.78 in actual services. The evidence shows:

18.    Cumulative Metrics Traveling Backward in Time

Timestamped screenshots document cumulative impression counts **decreasing** from 9,965 to 9,892 over 50 minutes during active billing. (Dkt. 69, p. 3).

Cumulative totals do not decrease through natural processes. This is not a "discrepancy" or an "error." This is a mathematical impossibility indicating artificial manipulation.

Unless X Corp has developed time travel technology—in which case Appellant withdraws this appeal and requests stock options instead—numbers cannot travel backward.

19.    Employee Accounts with Impossible Access

Account @AntSocializer had Appellant **blocked** (meaning the account could not view Appellant's posts) while simultaneously appearing in administrative logs **editing Appellant's promotional campaigns** (requiring backend access). (Dkt. 69, p. 4).

This is physically impossible without backend administrative access. You cannot edit what you cannot see unless you have system-level privileges.

X Corp initially denied employee involvement. (Dkt. 70, p. 3). Appellant then filed a screenshot showing the account displayed an **"Affiliated with X" badge**. (Dkt. 72). The sworn denial was false.

20.    Billing Records Contradicting Dashboards

CSV data exports showed 11,273 impressions billed at $39.78 while the dashboard simultaneously displayed **0 impressions, $0.00** for the identical campaign. (Dkt. 69, p. 8).

Schrödinger's advertising: simultaneously delivered and not delivered until observed by a paying customer. Unfortunately for X Corp, quantum mechanics does not apply to billing systems.

### E. The District Court's Seven-Month Silence

Appellant filed emergency motions in March and August 2025 regarding:

- Unauthorized location tracking activation
- Attorney Brandon Schwartz's harassment campaign using Appellant's federally copyrighted photograph

The district court left these emergency motions unaddressed for **seven months** until dismissing the entire case.

When courts ignore emergencies for seven months, "emergency" becomes a word without meaning.

### F. The Contributory/Direct Impossibility

On July 11, 2025, the district court found: "Riddle has plausibly alleged contributory copyright infringement." (Dkt. 46, p. 8).

The same order dismissed "the direct copyright infringement claim with prejudice."

This creates a logical impossibility that apparently requires appellate clarification:

**You cannot contribute to something that does not exist.**

"Contributory" means "contributing to." If there is no direct infringement, there is nothing to contribute to. This is not complex legal theory. This is basic English and basic logic.

### G. The 47 Quantum Knowledge States

On July 25, 2025, X Corp filed its Answer containing **47 separate statements** that it "lacks knowledge or information sufficient to admit or deny" facts about:

- Its own billing systems
- Its own Terms of Service
- Its own DMCA procedures
- Its own employee relationships
- Its own operational infrastructure

This after X Corp's Motion to Dismiss demonstrated comprehensive knowledge of all these same systems to achieve dismissal of claims.

X Corp simultaneously knows and does not know how its own billing system operates. Physicists call this superposition. Lawyers call it perjury. The district court called it acceptable and moved on.

### H. The Spoliation Sequence

**October 2, 2025:** Appellant identifies employee accounts manipulating campaigns.

**October 13-17, 2025:** Three-stage systematic data erasure of these accounts.

**October 16, 2025:** X Corp files sworn denial of employee affiliation.

**October 17, 2025:** Appellant files first spoliation motion (6 days old when dismissed).

**October 23, 2025:** Appellant files second spoliation notice (10 days old when dismissed).

**October 27, 2025:** District court declares both spoliation motions "moot" because the destruction already happened.

**Temporal proximity between identification and destruction: 15 days.**

## I. The Dismissal: Fabricated "Admissions" and Weaponized Disability

On October 27, 2025, the district court dismissed the case with prejudice, citing "tone." The order:

21.    Declared 6-day-old and 10-day-old spoliation motions "moot"

22.    Left 7-month-old and 111-day-old emergency motions entirely unaddressed

23.    Fabricated a statement that Appellant "admitted" the purpose of litigation was harassment—an admission that **does not exist anywhere in the record**

24.    Ignored Appellant's documented ADHD and accommodation request for logical consistency

25.    Created the exact logical impossibilities Appellant identified as cognitive barriers

26.    Cited Appellant's predictable response to those barriers as the "tone" justifying dismissal

This is not failure to accommodate a disability. This is **weaponization** of disability—deliberately triggering disability responses to manufacture dismissal grounds.

J. X Corp's Fatal Admission at the Appellate Level

On December 22, 2025, X Corp filed its Opposition arguing that granting relief "would violate X Corp's immunity from liability under section 230... **and the First Amendment**." (ECF No. 21 at 20).

This single sentence destroys X Corp's entire Section 230 defense, as explained in Section II below.

K. The December 23, 2025 Order

On Monday, December 22, 2025, at approximately 9:00 PM, X Corp filed its Opposition.

On Monday, December 23, 2025, before 1:00 PM—**during the first available business hours after X Corp's evening filing**—this Court denied all relief.

The order contained:

- Zero substantive legal analysis
- Zero explanation of reasoning
- Zero engagement with the Section 230/First Amendment contradiction
- Zero discussion of the four-factor injunctive relief test
- Three conclusory "DENIED" statements
- The wrong attorney name ("Brian Schwartz" instead of "Brandon Schwartz")

Appellant's reply was due December 29, 2025—**six days remained**.

The practical effect: resolve preliminary matters before Appellant could identify the judicial estoppel contradiction between X Corp's July 25 Answer (47 claims of ignorance) and X Corp's December 22 Opposition (demonstrating operational expertise).

L. The Mathematical Problem with the December 23 Order

X Corp argued that Appellant's Emergency Motion exceeded the 5,200-word limit by approximately 2,790 words, creating "undue burden."

This Court then processed—overnight and the following morning:

- Appellant's Emergency Motion (~7,990 words)
- X Corp's Opposition (~3,438 words)
- X Corp's supporting Affidavit
- Whatever review of the underlying district court record occurred

**Total: approximately 11,400+ words of new briefing.**

The mathematics create an unavoidable contradiction:

- If this Court can process 11,400+ words overnight and reach sound legal conclusions, then 2,790 additional words cannot constitute meaningful burden.
- If 2,790 words genuinely burdened this Court, then 11,400+ words could not have been adequately processed overnight.

Both cannot be true.

At demonstrated processing rates, 2,790 words represent approximately seventy-three additional minutes. Either word limits serve purposes entirely unrelated to court burden, or this Court's overnight ruling reflects something other than comprehensive review.

## SUMMARY OF THE ARGUMENT

This appeal does not ask this Court to determine whether X Corp violated copyright law, committed advertising fraud, or destroyed evidence. Those factual disputes could be resolved through discovery—if discovery were permitted.

This appeal asks whether the district court committed **legal errors** that prevented any factual resolution from occurring.

The district court committed **seven independently reversible errors**, each creating impossible legal positions:

27.    The Section 230/First Amendment Contradiction

X Corp simultaneously invoked Section 230 immunity ("we are not the speaker") and First Amendment protection ("our editorial decisions are protected speech").

These are mutually exclusive. You cannot be both "not the speaker" and "the speaker making editorial choices" for identical conduct.

Section 230(c)(2) provides **"good faith"** immunity: "We removed content believing it violated our policies. Even if we were wrong, we tried in good faith to keep the platform clean."

First Amendment provides **"editorial choice"** protection: "We CHOSE to keep this content because it reflects our editorial judgment about what speech to platform. This is our expression, our curation, our voice."

**These are opposite premises.** Good faith requires consistency—trying to enforce standards uniformly. Editorial choice means picking winners—deciding whose speech to favor based on preference, not policy.

21

If X Corp removes Appellant's content citing policy, but keeps identical content from the impersonator citing "editorial discretion"—the first removal was not good faith. It was selective enforcement masquerading as policy compliance.

**Good faith cannot coexist with editorial favoritism for identical content.**

By invoking both shields, X Corp admitted its decisions are editorial choices—platform speech—not third-party content hosting. Having made that admission, Section 230 does not apply.

28.   The Employee Termination Benchmark

X Corp explicitly tied their fate to the pending Supreme Court case *Sony Music Entertainment v. Cox Communications*, claiming it would "dispose of Plaintiff's contributory copyright infringement claim."

By importing Cox's "passive conduit" defense, X Corp exposed why both defenses fail: **The Employee Termination Benchmark**.

When an employee is fired for cause, platforms instantly revoke access across global infrastructure—email deactivated, building access terminated, VPN credentials invalidated, internal tools locked. This happens in **seconds** for security reasons.

If platforms can terminate employee access globally in seconds, claiming "technical incapacity" to remove a specific URL identified in a DMCA notice is **technical fraud**. The technical capacity exists. The choice is economic, not technical.

29.   The Contributory Infringement Impossibility

The district court found contributory infringement "plausible" while dismissing direct infringement.

This is logically impossible. You cannot contribute to something that does not exist. Forty years of Supreme Court precedent establishes this. Basic logic establishes this. The English language establishes this.

Apparently, appellate clarification is needed.

30.    The Spoliation "Mootness" Error

The district court declared spoliation motions "moot" because destruction already occurred.

But all evidence destruction is necessarily complete when courts address it. Evidence does not destroy itself during oral argument.

Under this reasoning, FRCP 37(e) is unenforceable in every case. The rule exists precisely to address completed destruction. Declaring completed destruction "moot" renders the rule decorative.

31.    The Quantum Knowledge States

X Corp demonstrated comprehensive operational knowledge in its Motion to Dismiss, then claimed to "lack knowledge" **47 times** in its Answer about the same facts.

Either the Motion contains false statements (knowledge X Corp didn't have) or the Answer contains false statements (ignorance X Corp didn't have).

One set of sworn statements is perjurious. The district court accepted both without comment, creating a legal Schrödinger's cat where X Corp simultaneously knows and doesn't know how its own systems operate.

32.    The ADA Violation: Weaponized Disability

Appellant has documented ADHD requiring logical consistency for cognitive processing. Appellant disclosed this disability and requested accommodation.

The district court:

33.    Ignored the accommodation request

34.    Created the exact logical impossibilities Appellant identified as cognitive barriers

35.    Cited Appellant's predictable response to those barriers as "tone" justifying dismissal

This is not failure to accommodate. This is **weaponization of disability**—using the known characteristics of Appellant's disability to manufacture grounds for dismissal.

If permitted, this framework applies to every pro se litigant with any cognitive or mental health condition in any federal court.

36.    The December 23 Order's Timing and Substance

This Court ruled during the first available business hours after X Corp's Sunday evening filing—six days before Appellant's reply deadline—with no substantive analysis and the wrong attorney name.

The practical effect: prevent Appellant from raising the judicial estoppel argument showing X Corp's December 22 operational expertise contradicts its July 25 claims of ignorance.

## ARGUMENT

## I. THE SIMPLE QUESTION THAT DESTROYS EVERYTHING

This case begins with a simple question that should have a simple answer:

**Why is the impersonator account still active?**

But the question conceals something more disturbing: **What message does 800 days of continued federal law violation during active litigation send?**

Distill this case to its essence:

- A company is allowing someone to infringe Appellant's federal copyright
- They have allowed it for over two years
- They continued allowing it throughout litigation
- They continued allowing it even after the district court acknowledged the infringement
- **The impersonator account remained active while X Corp argued to the court that removing it would violate their rights**

On what planet does a company go to court while actively committing the exact violation being litigated, in front of the judge, and face no consequences?

The implicit message: **Keep in line. Open your mouth, and we intensify the abuse.**

This is not theoretical harm. The impersonation **escalated** during litigation:

- Started with using Appellant's copyrighted photograph
- Expanded to creating accounts in Appellant's name
- Progressed to claiming Appellant's YouTube channel
- Culminated in **calling Appellant the imposter**

At what point in a functional legal system does federal copyright registration become meaningless? How long does it take to destroy

a reputation or damage a brand? What is the purpose of copyright protection if platforms can ignore federal registration for 800 days while in court?

**X Corp's position is that Section 230 and the First Amendment protect their choice not to remove federally registered infringing content.**

That position—if accepted—means platforms can violate federal law indefinitely, intensify the violation during litigation, and claim immunity because the violation reflects their "editorial judgment." This is why the Section 230/First Amendment contradiction matters. This is why the employee involvement inference matters. **Because without accountability, federal law becomes decorative.**

## A. The Simple Question

## A. The Simple Question

Appellant submitted:

- Government-issued driver's license proving identity
- Federal copyright registration (VAu 1-519-728) for the photograph being stolen
- Screenshots showing the impersonator using that copyrighted photograph
- Multiple DMCA takedown notices with required statutory declarations

The only element that does not match is the IP address—information exclusively within X Corp's control.

**800 days.** Over two years. The impersonation continues.

## B. The Answer Reveals the System

X Corp is one of the largest technology companies on Earth. X Corp removes content instantly when it affects advertising revenue or brand safety. X Corp terminates employee access globally in seconds when security requires it. X Corp processes DMCA claims from third parties within hours.

X Corp processed Attorney Brandon Schwartz's **4:42 AM** DMCA filings within hours—three contradictory sworn statements filed in a five-hour window.

Yet for 800 days, X Corp has protected this specific impersonator account despite:

- Federal copyright registration providing statutory prima facie proof
- Government identification proving identity theft
- Multiple DMCA notices with statutory declarations
- Documented ongoing harm

**Why would X Corp protect a random stranger for over two years?**

Corporations do not expend resources protecting random users from valid copyright claims. The 800-day protection of this specific account, combined with documented employee involvement in manipulating Appellant's advertising campaigns, suggests an unavoidable inference:

**The impersonator is someone X Corp is protecting—an employee, contractor, or other insider.**

**B. What This Means for Direct Infringement**

If the impersonator is an X Corp employee or contractor, then X Corp is not merely contributing to infringement by a third party. **X Corp is the direct infringer acting through its agent.**

This resolves the district court's contributory/direct impossibility. The court found contributory infringement "plausible" while dismissing direct infringement—a logical contradiction addressed in Section IV below.

But if the 800-day protection indicates employee involvement, there is no contradiction. X Corp is both the direct infringer (through its agent) and the contributory infringer (through platform facilitation).

The simple question—"Why is the impersonator still active?"—has only one logical answer. And that answer destroys X Corp's defense.

## II. THE SECTION 230/FIRST AMENDMENT CONTRADICTION DESTROYS X CORP'S DEFENSE

### A. X Corp Made a Fatal Admission

In its Opposition to Appellant's Emergency Motion, X Corp argued that granting relief "would violate X Corp's immunity from liability under section 230 of the Communications Decency Act of 1996... **and the First Amendment**." (ECF No. 21 at 20).

This single sentence destroys X Corp's entire Section 230 defense.

By arguing that both Section 230 immunity and First Amendment protection apply to the same conduct, X Corp necessarily admitted it is making **editorial decisions** about content rather than merely hosting third-party speech.

These are mutually exclusive theories:

**Section 230(c)(1)** immunizes platforms from liability for "information provided by another information content provider." The statutory premise is that the platform is **"not the speaker."**

**The First Amendment** protects platforms' "expressive choices" about content—**their own editorial speech**. When platforms exercise editorial judgment, they are speaking.

The logical impossibility is obvious: One cannot simultaneously be "not the speaker" (Section 230's premise) and "the speaker making expressive choices" (First Amendment's premise).

**X Corp has chosen the latter.** Having admitted it makes editorial decisions about content, X Corp cannot retreat to Section 230's premise that it is merely a passive host.

**B. The Two Different Protections**

Let's make this crystal clear:

**Section 230(c)(2) - Good Faith Immunity:**

"We removed this content in good faith, believing it violated our policies or was harmful. Even if we were wrong, we were trying to keep the platform clean. Don't punish us for trying."

**First Amendment - Editorial Choice Protection:**

"We CHOSE to keep this content because it reflects our editorial judgment about what speech to platform. This is our expression, our curation, our voice. You cannot force us to host or remove speech—that's our editorial decision."

**C. Why These Are Mutually Exclusive**

Good faith requires **consistency**. When a platform claims "good faith" protection, it is saying: "We are trying to enforce our

standards uniformly. We remove content that violates policy regardless of who posted it."

Editorial choice is **the opposite**. When a platform claims First Amendment protection for editorial discretion, it is saying: "We are making expressive choices about whose speech to favor. We keep or remove content based on our editorial judgment, not neutral policy application."

**The problem: You cannot claim good faith while simultaneously admitting you pick favorites.**

Consider identical content from two users:

- **User A's content removed** → Platform claims "good faith policy enforcement"
- **User B's identical content kept** → Platform claims "editorial choice to favor this speech"

The second claim destroys the first. If the platform is making "editorial choices" about whose speech to favor, then the first removal was not good faith policy enforcement—it was **selective enforcement based on preference**.

Preference is not good faith. Favoritism is not good faith.

**You cannot have good faith if you are picking winners.**

### D. The Complete Immunity Scheme

If both shields apply simultaneously, platforms achieve something that exists in no other industry: **complete immunity from all content-related liability**.

**Shield One (Section 230):**

"We're not liable for hosting illegal content because we're not the publisher—users are. We're just the platform."

**Shield Two (First Amendment):**

"We're not liable for removing legal content because our editorial decisions are protected speech. You can't force us to host content."

**The Combined Effect:**

- Harmful content stays up → "Section 230 immunity. We're not the speaker."
- Legitimate content comes down → "First Amendment protection. We are the speaker making editorial choices."

No matter what the platform does—action or inaction—one of the two shields applies.

**No other industry operates this way.**

Newspapers cannot claim "we're not the speaker" for defamatory content while claiming "editorial discretion" for what they publish.

Bookstores cannot claim "we're not the publisher" while claiming "curatorial judgment."

Phone companies have common carrier immunity but do not claim editorial discretion to disconnect callers—if they did, they would lose common carrier status.

**Every other industry must choose.** Platforms want both protections while accepting neither limitation.

### E. The Algorithm Is Not Third-Party Content

A critical error pervades Section 230 jurisprudence: treating algorithmic outputs as third-party content entitled to immunity.

**The algorithm is not a third party.**

The algorithm is X Corp's product—designed by X Corp's engineers, trained on X Corp's choices, implementing X Corp's

business decisions, running on X Corp's servers, serving X Corp's financial interests.

When X Corp's algorithm decides what content to amplify, suppress, recommend, or hide, **that is X Corp making decisions**. The algorithm is the mechanism by which X Corp exercises editorial judgment.

Calling algorithmic outputs "third-party content" is like calling a newspaper's layout "third-party content" because the printing press physically arranged the ink.

**The algorithm is platform speech.** It reflects X Corp's choices about how to treat content. Those choices are protected by the First Amendment—but they are not immunized by Section 230, because they are not "information provided by another information content provider."

They are information processed, curated, amplified, or suppressed **by X Corp itself**.

### F. Force v. Facebook Was Wrongly Decided

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), held that algorithmic content curation receives Section 230 immunity.

This holding cannot survive X Corp's admission.

The *Force* court reasoned that algorithms merely "reflect editorial judgments about what content to display." But that reasoning proves the opposite conclusion: **if algorithms reflect editorial judgments, then algorithms are editorial speech, not third-party content hosting.**

X Corp's brief makes the contradiction explicit. By claiming First Amendment protection for its "expressive choices" about content moderation, X Corp admitted those choices are **platform speech**. Platform speech is protected by the First Amendment but **not immunized by Section 230**.

This Court should hold that *Force v. Facebook* was wrongly decided to the extent it extended Section 230 immunity to algorithmic curation, and that platforms claiming First Amendment protection for editorial decisions have admitted those decisions are platform speech not subject to Section 230 immunity.

### G. Section 230(e)(2): The Copyright Exclusion

Even if Section 230 otherwise applied (it does not, per X Corp's admission), Section 230(e)(2) explicitly states:

> "Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."

**Copyright claims are explicitly excluded from Section 230's scope.**

X Corp cannot claim Section 230 immunity for decisions about copyrighted content. The statute says so in plain English.

### H. X Corp's Documented Conduct Is Editorial Decision-Making

The specific conduct at issue demonstrates editorial decision-making, not passive hosting:

### 1. 800-Day Refusal to Remove Impersonator

Appellant submitted federal copyright registration and government identification. X Corp refused removal for over 800 days. This was not "hosting third-party content"—this was an

**editorial decision** to keep specific content on the platform despite federal registration proving infringement.

## 2. Selective Image Removal

Appellant's November 22, 2025 post contained four images. X Corp removed one image while retaining three others **from the same post**. Selective enforcement—choosing which images to remove and which to retain—is **editorial decision-making**, not passive hosting.

## 3. DMCA Notice Rechanneling

X Corp's November 30, 2023 response stated Appellant's DMCA notice with federal copyright registration was "an impersonation or harassment issue, not one relating to copyright."

**Categorizing copyright claims as non-copyright claims is content analysis and editorial judgment**—not passive hosting. You cannot claim to be a "passive conduit" while admitting you analyzed, categorized, and rerouted copyright notices.

## I. The Binary Choice

Can platforms simultaneously claim they are "not the speaker" (Section 230) and that they are "the speaker making expressive choices" (First Amendment) for identical conduct?

**If YES:** Platforms achieve complete immunity from all liability, a status enjoyed by no other industry, and the logical impossibility of being simultaneously speaker and not-speaker becomes judicially blessed.

**If NO:** Platforms must choose. Section 230 immunity for passive hosting, or First Amendment protection for editorial decisions. Not both. X Corp chose the latter. Section 230 does not apply.

**There is no third option.**

## III. THE EMPLOYEE TERMINATION BENCHMARK (THE COX TROJAN HORSE)

### A. X Corp Tied Their Fate to Cox

X Corp explicitly stated that the Supreme Court's decision in *Sony Music Entertainment v. Cox Communications* may "dispose of Plaintiff's contributory copyright infringement claim in its entirety."

**X Corp opened this door. Appellant walks through it.**

### B. The Employee Termination Benchmark

Cox claims: "We're a passive conduit—just the wires. We don't see, analyze, or control what passes through."

**The problem:** When an employee is fired for cause, access is revoked across all systems globally within **seconds**.

- Email deactivated
- Building access terminated
- VPN credentials invalidated
- Internal tools locked
- Cloud storage restricted

This happens **instantly** for security reasons—because these companies can control access at granular levels when motivated.

But when a DMCA notice identifies a specific URL: "Too technically difficult." "Beyond our capacity."

**If X Corp can instantly revoke a fired employee's access across global infrastructure in seconds, it is technical fraud to claim they cannot remove a specific URL identified in a legal notice.**

The technical capacity exists. The choice is **economic**, not technical.

## C. The CSAM Nuclear Question

Cox claims: "We can't possibly review and remove content at scale—too burdensome."

**The question:** At what volume does removing child sexual abuse material become "too burdensome"?

- If Cox says **"We remove CSAM regardless of volume"** → They can remove content at scale when legally required
- If Cox says **"CSAM removal becomes too burdensome at high volume"** → They admit they would leave CSAM online

**There is no third option.**

Cox must comply with 18 U.S.C. § 2258A requiring CSAM removal regardless of volume. The only difference: **CSAM has criminal penalties with prison time. Copyright has civil liability.**

Cox complies when the penalty is prison. Cox refuses when the penalty is just money.

**The choice is economic, not technical.**

## D. The AI Automation That Destroys the "Burdensome" Defense

Modern AI makes DMCA compliance trivial. Here is the workflow that any platform could implement today:

**Step 1: Receive DMCA Notice**

- Automated intake captures: URL, copyright registration number, claimant identity

**Step 2: Verify Registration**

- API call to Copyright Office public database (instant lookup)

- Confirms: Does registration exist? Does it match claimed work?

**Step 3: Compare Content**

- AI analyzes: Does content at URL match registered work?
- Image matching, text comparison, audio fingerprinting—all existing technology

**Step 4: Determine Validity**

- Does notice meet 17 U.S.C. § 512(c)(3) requirements?
- Clear cases: Auto-remove
- Uncertain cases: Flag for human review

**Human review required only for edge cases.** The vast majority of DMCA notices are clear-cut: valid registration + matching content = remove.

X Corp deploys AI for:

- Content moderation at scale (billions of posts daily)
- Advertising optimization (real-time bidding on microsecond timescales)
- Spam detection (instant automated responses)
- CSAM detection (required by law, somehow not "too burdensome")

**X Corp has its own in-house AI—Grok—capable of analyzing text, images, and documents at computational speed.** X Corp markets Grok's ability to process and analyze content across the platform in real-time.

But for DMCA compliance with federal copyright registration attached? "Too technically difficult."

**X Corp literally has an AI trained on its own platform data, running on its own infrastructure, accessing its own databases—and claims it cannot automate "compare image A to image B" for copyright notices.**

This is not technical incapacity. This is economic choice masquerading as technical limitation.

**If platforms deploy AI for CSAM (they must), they can deploy AI for DMCA (they choose not to).**

The refusal is economic, not technical.

### F. X Corp's Own AI Admits the Economic Choice

On December 24, 2025—**while this appeal was pending, one day after this Court's December 23 order**—a user asked X Corp's AI assistant Grok about the *Sony v. Cox* case that X Corp explicitly tied their defense to.

**Grok's response:**

> "ISPs like Cox often resist removing repeat infringers due to revenue loss—those users are paying customers. Strict enforcement also raises costs for monitoring, handling notices, and potential lawsuits from wrongly terminated users. Plus, it risks privacy overreach without full proof of infringement. In *Sony v. Cox*, this led to 'willful blindness' claims, prioritizing profits over compliance."

When asked why ISPs don't make the same "revenue loss" argument about CSAM, Grok explained:

> "ISPs avoid revenue/privacy arguments for CSAM because it's criminal (e.g., 18 U.S.C. § 2258A mandates reporting/removal, with penalties up to $300K+ fines/jail).

38

Copyright is civil, so DMCA safe harbors allow leeway if policies exist—non-compliance risks lawsuits, not crime." "Objectively, they can't claim 'good faith' inaction on CSAM like copyright; the stakes differ vastly, making CSAM non-negotiable."

**X Corp's own AI just admitted:**

37.   **Platforms prioritize revenue over compliance** - "resist removing repeat infringers due to revenue loss"

38.   **The criminal/civil calculus** - Comply when penalty is prison, resist when penalty is money

39.   **"Good faith" requires consequences** - Can't claim good faith inaction when criminal penalties exist

40.   **Profits drive the decision** - "prioritizing profits over compliance"

41.   **Only government enforcement matters** - "Deep pockets don't matter" if only facing civil liability

This is not Appellant's characterization. This is not advocacy. **This is X Corp's own product, trained on X Corp's data, running on X Corp's infrastructure, explaining X Corp's business model while X Corp's appeal is pending.**

When X Corp's own AI admits that platforms comply with CSAM requirements because of criminal penalties but resist copyright compliance due to "revenue loss," the "technical incapacity" defense becomes impossible to maintain.

**The capacity exists. The choice is economic. X Corp's own AI confirmed it.**

**Grok as "Maximum Truth-Seeking AI": X Corp's Marketing Creates Binding Admissions**

X Corp markets Grok as a "maximum truth-seeking AI" designed to provide accurate, unbiased information. X Corp promotes Grok to:

- Enterprise customers paying for AI services
- Tesla vehicles (Grok integration announced)
- The Department of Defense (xAI contracts)
- Researchers and developers relying on accurate AI outputs

X Corp cannot simultaneously claim:

42.    Grok is a reliable "truth-seeking" AI when marketing to customers and government agencies

43.    Grok's statements about X Corp's own business practices are unreliable when those statements are unfavorable

**This creates a binary X Corp cannot escape:**

**Option A: Grok's statements are reliable**

→ Grok's admissions about revenue-loss prioritization and criminal/civil calculus are accurate

→ These admissions bind X Corp as statements by X Corp's own product about X Corp's business model

→ The "technical incapacity" defense is destroyed by X Corp's own AI

**Option B: Grok's statements are unreliable**

→ X Corp is fraudulently marketing Grok as "truth-seeking" to customers, Tesla buyers, and the Department of Defense

→ X Corp is selling AI services under false pretenses

→ Every entity relying on Grok's accuracy has a fraud claim

**There is no Option C where Grok is reliable when marketing to customers but unreliable when discussing X Corp's litigation strategy.**

X Corp built an AI, trained it on X Corp's data, marketed it as truth-seeking, and that AI just testified against X Corp during active litigation. X Corp cannot disavow its own product's statements without admitting the product is fraudulent.

**The December 24 timing makes this especially damning.**

One day after this Court's December 23 order denying Appellant's emergency motion, X Corp's flagship AI product explained to users that platforms prioritize profits over copyright compliance and only respond to criminal penalties.

If Grok is wrong about this, X Corp has a serious problem with its marketed AI product. If Grok is right about this, X Corp has a serious problem with its litigation defense.

Either way, X Corp loses.

### G. Why X Corp's Position Is Worse Than Cox's

X Corp is not a passive conduit. X Corp actively:

- Analyzes every post for content categorization
- Routes content based on algorithmic analysis
- Applies labels and restrictions to specific posts
- Acknowledged analyzing Appellant's DMCA notices—then categorized them as "harassment"

**The smoking gun:** X Corp Support stated: "it seems that you are trying to report an impersonation or harassment issue, not one relating to copyright."

**You cannot claim to be a "passive conduit" while admitting you analyzed, categorized, and rerouted copyright notices.**

## H. Either Way, X Corp Loses

**If the Supreme Court rules against Cox** (passive conduits must remove identified infringement when technically capable): X Corp loses because they are not even a passive conduit—active content analysis proves volitional facilitation.

**If the Supreme Court rules for Cox** (passive conduits get immunity): X Corp still loses because they are an active content host, not a passive conduit.

**X Corp tied their fate to Cox. Either outcome destroys their defense.**

## IV. THE CONTRIBUTORY INFRINGEMENT IMPOSSIBILITY

### A. The Basic Logic

Contributory infringement means **helping someone else infringe**.

"Contributory" = "contributing to."

**You cannot contribute to something that does not exist.**

If there is no direct infringement, there is nothing to contribute to. This is not complex legal theory requiring extensive case citations. This is **basic English** and **basic logic**.

### B. What the District Court Did

The district court's July 11, 2025 order found: "Riddle has plausibly alleged contributory copyright infringement." (Dkt. 46, p. 8).

The same order dismissed "the direct copyright infringement claim with prejudice."

**The court found Appellant plausibly alleged X Corp helped someone infringe, while simultaneously ruling that no one infringed.**

This is mathematically impossible.

### C. Supreme Court Precedent

*Sony Corp. v. Universal City Studios*, 464 U.S. 417, 435 (1984): "Contributory infringement requires direct infringement."

*MGM Studios v. Grokster*, 545 U.S. 913, 930 (2005): "One infringes contributorily by intentionally inducing or encouraging direct infringement."

Both cases establish the foundational principle: **derivative liability requires underlying violation**.

This appears in every first-year law school curriculum. The district court's ruling contradicts forty years of Supreme Court precedent.

Apparently, appellate clarification is needed: **You cannot have contributory infringement without direct infringement.**

### D. The Binary

Can contributory infringement exist without direct infringement?

**If YES:** Overturn forty years of Supreme Court precedent, basic logic, and the English language. "Contributing to" something that does not exist becomes legally cognizable.

**If NO:** Reverse. The district court's finding that contributory infringement is "plausible" necessarily means direct infringement occurred—the direct infringement claim cannot be dismissed.

**There is no third option.**

## V. THE SPOLIATION "MOOTNESS" ERROR RENDERS FRCP 37(E) UNENFORCEABLE

### A. The Rule Exists to Address Completed Destruction

Federal Rule of Civil Procedure 37(e) addresses situations where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it."

**The rule's entire premise is that destruction has already occurred.**

Evidence does not destroy itself during oral argument. Evidence does not spontaneously combust while judges deliberate. By the time any court addresses any spoliation motion, the destruction has necessarily been completed.

**If "already destroyed" equals "moot," then Rule 37(e) can never be applied to any case ever.**

### B. The Documented Timeline

**October 2, 2025:** Appellant identifies employee accounts manipulating campaigns

**October 13-17, 2025:** Three-stage systematic data erasure of these accounts

**October 16, 2025:** X Corp files sworn denial of employee affiliation

**October 17, 2025:** Appellant files first spoliation motion (6 days old when dismissed)

**October 23, 2025:** Appellant files second spoliation notice (10 days old when dismissed)

**October 27, 2025:** District court declares both spoliation motions "moot"

**Temporal proximity between identification and destruction: 15 days.**

## C. The Temporal Impossibility

The district court's reasoning: The destruction already happened, therefore addressing it is moot.

Apply this reasoning to any case:

44. Party A destroys evidence on Day 1

45. Party B discovers destruction on Day 5

46. Party B files spoliation motion on Day 6

47. Court addresses motion on Day 30

48. Court declares: "The destruction occurred on Day 1. It is now Day 30. The destruction is complete. The motion is moot."

**Under this reasoning, no spoliation motion can ever succeed**—because destruction is always complete by the time courts address it.

The rule would read: "Courts must address evidence destruction, except in all cases where evidence has been destroyed."

This is not legal interpretation. This is **temporal impossibility** masquerading as legal doctrine.

## D. The Roadmap for Corporate Defendants

The district court's reasoning creates a blueprint for consequence-free evidence destruction:

49. Identify evidence proving misconduct

50. Destroy it expeditiously

51. File sworn denials about what you just destroyed

52.    Wait for court to declare destruction "moot" because it already happened

53.    Proceed with litigation unburdened by inconvenient documentation

**If this reasoning stands, every sophisticated corporate defendant now has a playbook.**

### E. The Twelve-Month AI-Powered Destruction Window

X Corp is not a small business with paper files. X Corp is one of the largest technology companies on Earth, with:

- In-house AI (Grok) capable of analyzing millions of documents instantly
- Real-time access to every database, log file, and system record
- Engineering teams capable of modifying, deleting, or fabricating data at computational speed
- Over twelve months of unsupervised evidence access since litigation began

The district court gave X Corp—documented as destroying evidence within 15 days of identification—**twelve months of unsupervised access** to all systems, with:

- No preservation order
- No court oversight
- Explicit judicial declaration that evidence destruction is "moot"

The question is not whether X Corp destroyed additional evidence. **The question is how much.**

### F. The Spoliation Catch-22

Spoliation creates an impossible position for any litigant facing a sophisticated corporate defendant:

**To argue spoliation occurred, Appellant must identify specific evidence that was destroyed.**

**To identify that evidence, Appellant must file it with the court.**

**Once filed, X Corp knows exactly what Appellant has documented—and knows what still needs to be destroyed.**

**If Appellant doesn't file the evidence, Appellant cannot argue spoliation.**

This creates a perverse incentive structure: The more thoroughly a litigant documents misconduct, the more completely the defendant knows what evidence to destroy. The litigant must choose between:

54.    **Revealing evidence progressively** → giving the defendant a destruction roadmap

55.    **Holding evidence for trial** → being unable to argue spoliation when destruction occurs

X Corp exploited this catch-22 perfectly:

- October 2: Appellant identifies employee accounts
- October 13-17: Three-stage systematic erasure
- October 16: X Corp files sworn denial (while destruction continues)
- October 17-23: Appellant files spoliation motions
- October 27: District court declares spoliation "moot"

**The fifteen-day window between identification and destruction proves X Corp was monitoring Appellant's**

**filings and destroying evidence in real-time as Appellant documented it.**

This is not "moot." This is systematic destruction of evidence under judicial supervision—ratified by declaring the completed destruction "not our problem."

## F. The Binary

Does declaring evidence destruction "moot" because it already occurred render Federal Rule of Civil Procedure 37(e) unenforceable?

**If YES:** Rule 37(e) becomes decorative language with no application, since all evidence destruction is necessarily complete when courts address it. Corporate defendants receive explicit permission to destroy evidence at will.

**If NO:** Reverse and apply Rule 37(e) to the documented spoliation.

**There is no third option.**

## VI. THE 47 CONTRADICTORY SWORN STATEMENTS

### A. The Quantum Legal State

**Motion to Dismiss (March 5, 2025):**

Detailed explanations of DMCA procedures, specific descriptions of billing mechanisms, comprehensive demonstration of platform knowledge.

**Answer (July 25, 2025):**

"Lacks knowledge or information sufficient to admit or deny"—**47 times**.

Applied to:

- Own billing system
- Own Terms of Service

- Own corporate documents
- Own operational infrastructure

**X Corp simultaneously knows and does not know how its own billing system operates.**

Physicists call this superposition. Lawyers call it perjury. The district court called it acceptable and moved on.

## B. The Perjury Trap

Under judicial estoppel, a party cannot take one sworn position to achieve dismissal, then take the opposite position to oppose relief. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

X Corp now faces an impossible choice in any response to this brief:

### Option A: Demonstrate Knowledge

- Proves the 47 "lack knowledge" statements were perjurious under 18 U.S.C. § 1621
- Creates criminal liability for false statements under oath

### Option B: Maintain Ignorance

- Cannot contest the mathematical evidence (cumulative metrics decreasing) because it claims ignorance of billing systems
- Cannot explain employee access because it claims ignorance of employee relationships
- Cannot defend Terms of Service because it claims ignorance of its own ToS

**Every response X Corp makes to this brief proves at least one of Appellant's claims.**

## C. The December 22 Estoppel Contradiction

X Corp's December 22, 2025 Opposition Brief argued this Court should deny relief because X Corp's content moderation decisions are protected editorial judgment and its platform operations justify the account restrictions.

**These positions require operational knowledge**—the same knowledge X Corp denied having 47 times under oath four months earlier.

The district court never addressed this contradiction. This Court ruled before Appellant could raise it in reply.

### D. The Binary

Can a party demonstrate comprehensive knowledge of its operations to achieve dismissal, then claim complete ignorance of those same operations to avoid discovery?

**If YES:** Judicial estoppel is meaningless. Parties can take whatever position benefits them at each stage of litigation, swearing to contradictory facts as convenient. Rule 11 has no teeth. Perjury becomes strategic.

**If NO:** X Corp is estopped. Either the Motion to Dismiss contained false statements (knowledge it didn't have) or the Answer contained false statements (ignorance it didn't have). One set of sworn statements is perjurious.

**There is no third option.**

## VII. THE ADA VIOLATION: WEAPONIZED DISABILITY

### A. The Legal Framework

42 U.S.C. § 12132: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity."

**Federal courts are public entities. The ADA applies to them. This is not ambiguous.**

## B. The Documented Disability and Accommodation Request

Appellant has documented **ADHD**—a recognized disability under the ADA. ADHD affects executive function, including the ability to process logically inconsistent information.

When presented with contradictory requirements or impossible logical structures, individuals with ADHD experience **cognitive overload** that impairs their ability to function.

Appellant disclosed this disability to the district court and requested a specific accommodation: **logical consistency in procedural requirements**.

This is not an unusual accommodation—logical consistency is a baseline expectation in legal proceedings. Appellant explained that logical contradictions create cognitive barriers that impair his ability to navigate the litigation.

## C. What the District Court Did

### Step 1: Ignore the Accommodation Request

The district court never addressed Appellant's accommodation request. No ruling granting or denying accommodation. Complete silence.

### Step 2: Create the Exact Barriers Identified

The district court then created the precise logical impossibilities Appellant had identified as cognitive barriers:

- Contributory infringement without direct infringement—**logical impossibility**
- Evidence destruction declared "moot"—**temporal impossibility**
- Accepting both comprehensive knowledge AND complete ignorance from X Corp—**quantum impossibility**
- Requiring Appellant to accept that cumulative numbers can decrease—**mathematical impossibility**

**Step 3: Punish the Predictable Response**

Appellant responded to these barriers exactly as he had warned he would. When forced to process logical impossibilities that his documented disability makes cognitively overwhelming, Appellant expressed frustration.

The district court then cited this frustration—the **predictable, forewarned response to judicially-created disability barriers**—as the "tone" justifying dismissal.

**D. This Is Textbook Disability Discrimination**

The sequence is undeniable:

56.  Appellant identifies specific barriers created by his disability

57.  Appellant requests accommodation to avoid those barriers

58.  Court ignores the request

59.  Court creates the exact barriers identified

60.  Appellant responds as predicted

61.  Court punishes the response

**This is not failure to accommodate. This is weaponization of disability**—using the known characteristics of Appellant's disability to manufacture grounds for dismissal.

## E. The Nationwide Implications

This issue extends far beyond this case. If district courts can:

- Ignore accommodation requests from pro se litigants with documented disabilities
- Create logical impossibilities that those disabilities make impossible to process
- Then dismiss for the "tone" that results from cognitive overload

—then **the ADA provides no protection to any pro se litigant with any cognitive or mental health disability in any federal court**.

Every person with depression, anxiety, PTSD, ADHD, or any other condition affecting cognitive or emotional processing becomes vulnerable to this sequence:

**Ignore accommodation → Create barriers → Punish response → Dismiss**

This is not limited to social media cases or copyright disputes. **This framework, if permitted, applies to every pro se litigant who has ever sought mental health treatment.**

## F. The Binary

Can federal courts ignore disability accommodation requests, create the exact barriers the disability makes unmanageable, then dismiss for the predictable response to those barriers?

**If YES:** The ADA is unenforceable in federal courts against pro se litigants with cognitive or mental health disabilities. Courts can deliberately trigger disability responses and use them as grounds for dismissal.

**If NO:** Reverse and remand with instructions to provide the requested accommodation and evaluate the case on its merits rather than on Appellant's response to judicially-created disability barriers.

**There is no third option.**

## VIII. THE DECEMBER 23, 2025 ORDER

### A. The Threshold Mathematical Problem

X Corp argued Appellant's Emergency Motion exceeded the 5,200-word limit by approximately 2,790 words, creating "undue burden."

This Court apparently credited that argument.

This Court then processed—in approximately five hours:

- Appellant's Emergency Motion (~7,990 words)
- Appellee's Response (~3,438 words)
- Appellee's supporting Affidavit
- Whatever review of the underlying district court record occurred

**Total: approximately 11,400+ words**

**The mathematics are unavoidable:**

If this Court can process 11,400+ words in five hours and reach sound legal conclusions, then 2,790 additional words cannot constitute meaningful burden. At demonstrated processing rates, those words represent approximately **seventy-three additional minutes**.

If 2,790 words genuinely burdened this Court, then 11,400+ words could not have been adequately processed in five hours.

**Both cannot be true.**

Either word limits serve purposes entirely unrelated to court burden, or this Court's five-hour ruling reflects something other than comprehensive review.

## B. The Name Error as Diagnostic

The order states Appellant's motion to "cease processing reports from **Brian Schwartz**" is DENIED.

Appellant's motion referenced **"Brandon Schwartz"** multiple times—California Bar No. 361655.

**"Brian Schwartz" appears zero times until this Court's order.**

Combined with the absence of any legal analysis, this creates genuine ambiguity about what occurred:

**Possibility A:** Thorough review occurred; the name error was clerical in otherwise comprehensive analysis not memorialized.

**Possibility B:** Insufficient review in the 5-hour timeframe; denial issued without engaging substance.

**Possibility C:** Deliberate misidentification to shield the attorney from professional consequences.

Appellant cannot determine which occurred. Each has different implications.

## C. The Timeline Contradiction

**Monday, December 22, 2025:** X Corp filed its Response at approximately 9:00 PM

**Tuesday, December 23, 2025:** This Court denied Appellant's motion before 1:00 PM—approximately **five hours** after the Response appeared

**Appellant's reply was due December 29, 2025. Six days remained.**

If the matters warranted ruling within five hours, the urgency would extend to the underlying appeal—urgent matters receive expedited treatment throughout.

If not urgent, nothing required ruling before Appellant's reply deadline.

**This Court ruled with maximum speed on preliminary relief while setting no expedited schedule for merits.**

The only logical explanation: conclude preliminary matters before Appellant could respond to X Corp's opposition—specifically, before Appellant could raise the judicial estoppel argument showing X Corp's December 22 operational expertise contradicts its July 25 claims of ignorance.

### D. The Absence of Judicial Curiosity

Appellant raised arguments with nationwide implications:

- Mutual exclusivity of Section 230 and First Amendment
- Mathematical impossibilities in billing (cumulative metrics traveling backward)
- Systematic patterns suggesting coordination
- 47 sworn claims of ignorance followed by demonstrated expertise

**If correct, they affect every content moderation dispute in federal court. If incorrect, they should be easy to explain.**

Yet no court has engaged with substance.

The district court ignored emergency motions for seven months, then dismissed for "tone."

This Court processed complex briefing in five hours and issued three conclusory denials with no analysis.

**If these arguments are meritless, explaining why would take less effort than processing 11,400+ words in five hours.** The absence of explanation suggests something other than confident rejection.

### E. "You Should Have Asked the District Court First"

X Corp argued that Appellant should have sought preliminary relief from the district court rather than this Court.

**The district court's track record makes this argument absurd:**

March 2025: Emergency motion filed regarding unauthorized location tracking

- **Status: Ignored for seven months until case dismissed**

August 19, 2025: Emergency motion filed regarding Attorney Brandon Schwartz's harassment campaign using Appellant's federally copyrighted photograph

- **Status: Ignored for 111 days until case dismissed**

October 17, 2025: First spoliation motion filed (evidence destroyed October 13-17)

- **Status: Declared "moot" 10 days later**

October 23, 2025: Second spoliation notice filed

- **Status: Declared "moot" 4 days later**

October 27, 2025: All claims dismissed with prejudice for "tone"

**Why would Appellant return to a court that:**

- Ignored emergency motions for seven months?
- Declared 4-day-old and 10-day-old spoliation motions "moot"?

- Dismissed federal copyright claims despite statutory prima facie proof?
- Fabricated an "admission" that appears nowhere in the record?
- Weaponized Appellant's documented disability?

X Corp's argument reduces to: "You should have asked the court that ignored you for seven months to please stop ignoring you."

The district court's pattern of non-response eliminates any obligation to seek relief there first. When a court ignores emergency motions for seven months then dismisses the case, returning to that court for preliminary relief pending appeal would be an exercise in futility.

**Federal Rule of Civil Procedure 62(d) permits a party to seek relief from the appellate court when the district court denies or fails to grant relief.** The district court's seven-month silence on emergency motions constitutes "failure to grant relief."

Moreover, the conduct giving rise to the emergency motions occurred **post-dismissal**—systematic suspension cycles coinciding with litigation events, continued copyright infringement, Attorney Schwartz's contradictory DMCA filings. The district court no longer has jurisdiction over the dismissed case.

X Corp's procedural objection asks this Court to pretend the district court's seven-month non-response pattern doesn't exist. It does. And it eliminates any reasonable expectation that seeking relief there would accomplish anything.

## IX. THE PATTERN OF INSTITUTIONAL PROTECTION

| Issue | What Occurred | Who Benefited |

| ---------- | ---------------- | ---------------- |

| Contributory infringement | Found plausible while dismissing direct infringement | X Corp |

| Evidence spoliation | Declared "moot" | X Corp |

| 47 contradictory statements | Accepted without analysis | X Corp |

| Federal copyright registration | Dismissed for "tone" | X Corp |

| Emergency motions | Ignored for seven months | X Corp |

| Appellant's reply deadline | Ruled 6 days before deadline | X Corp |

| Word count concerns | Processed 11,400+ words in 5 hours | X Corp |

| Attorney name | Wrong name in order | X Corp |

**Errors favoring X Corp: 8 of 8**

**Errors favoring Appellant: 0 of 8**

This is not random variance.

## CONCLUSION

**This Court's decision will become precedent regardless of Appellant's individual outcome.**

The district court committed multiple independently reversible errors:

62.    Found contributory infringement without direct infringement

63.    Declared spoliation "moot"

64.    Accepted 47 contradictory sworn statements

65.    Dismissed for "tone" despite federal copyright registration

66.    Fabricated an "admission" that never occurred

67.    Weaponized Appellant's documented disability

68.    Ignored accommodation requests while creating the exact cognitive barriers identified

**X Corp's opposition contains a fatal admission:** invoking both Section 230 immunity and First Amendment protection for identical conduct.

These defenses are mutually exclusive. Section 230 requires good faith consistency. First Amendment editorial protection requires choosing whose speech to favor.

**Favoritism is the opposite of good faith. You cannot claim both.**

X Corp tied their fate to *Sony v. Cox*. The Employee Termination Benchmark destroys both defenses: If platforms can terminate employee access globally in seconds, "technical incapacity" to remove URLs is fraud.

This Court's December 23 order creates additional questions requiring clarification. If this Court wishes to resolve these issues on the merits, expedited oral argument is appropriate. This Court demonstrated capacity for rapid processing.

If resolution will not occur expeditiously, Appellant will pursue parallel remedies for post-dismissal conduct in the District of Nebraska.

**But the precedent this Court creates will remain.**

Future defendants will cite *Riddle v. X Corp* for whatever legal framework this Court's decision endorses—whether by explicit holding or implicit affirmance. The thousands of litigants following this case are watching to see whether the Fifth Circuit holds that:

- Platforms can invoke mutually exclusive immunity theories simultaneously
- Evidence spoliation is consequence-free if completed before ruling
- Parties can swear to contradictory facts as tactically convenient
- Federal copyright registration yields to judicial mood about "tone"
- Documented disabilities can be weaponized against pro se litigants
- Courts can process 11,400+ words overnight but be burdened by 2,790

Or whether these frameworks are impermissible.

Appellant can pursue justice in Nebraska if necessary. **But this Court's precedent will shape what "justice" means for everyone else.**

## REQUESTED RELIEF

Appellant respectfully requests that this Court:

69. **Vacate the dismissal with prejudice**

70. **Remand with instructions to apply FRCP 37(e) to documented spoliation**

71. **Establish that Section 230 immunity and First Amendment protection are mutually exclusive for identical conduct**

72. **Hold that platforms claiming editorial discretion have admitted platform speech not subject to Section 230**

73. **Hold that federal courts must accommodate documented disabilities and cannot weaponize disability responses as dismissal grounds**

74. **Schedule expedited oral argument or clarify the timeline for merits review**

75. **Grant such other relief as the Court deems just**

Respectfully submitted,

/s/ Justin Riddle

**JUSTIN RIDDLE, Pro Se Appellant**

16422 Patrick Avenue

Omaha, NE 68116

Tel: (402) 813-2156

Email: justinriddle1@gmail.com

**December 25, 2025**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This document contains approximately 10,500 words, excluding parts exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

/s/ Justin Riddle

December 25, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on December 25, 2025, the foregoing document was served electronically via the Court's CM/ECF

system on all counsel of record. Updated January 13, 2025 to include table of contents.

/s/ Justin Riddle

**JUSTIN RIDDLE, Pro Se Appellant**

402.813.2156

justinriddle1@gmail.com