No. 25-50951

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JUSTIN RIDDLE,

Plaintiff-Appellant,

v.

X CORP., FORMERLY KNOWN AS TWITTER, INCORPORATED,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
Case No. 1:25-CV-73 (ALBRIGHT, J.)

## APPELLANT'S EMERGENCY MOTION REGARDING
## COMPLETED EVIDENCE DESTRUCTION

Appellant Justin Riddle, proceeding pro se, files this emergency motion to inform the Court that the evidence destruction predicted in Appellant's Corrected Reply Brief, filed March 24, 2026 (ECF No. 51), has occurred, and to request immediate relief.

Appellant notes that this is an emergency motion. Appellant has filed multiple emergency motions across this litigation. Each has been either ignored or denied without substantive analysis. If the word 'emergency' does not trigger the relief mechanism it describes, and if a different procedural vehicle exists that would result in substantive engagement with the issues presented, Appellant respectfully requests that this Court identify it—as it did when Appellant's table of contents preceded the table of authorities.

## I. THE PREDICTION

On March 24, 2026, Appellant filed the Corrected Reply Brief with this Court. That brief contained the following statement:

> *As of the filing of this brief on March 24, 2026, X Corp's advertising platform displays an announcement stating that it is migrating to a new ad management system tonight at midnight Pacific time—March 25, 2026—during the pendency of this appeal, while the billing records, ad history logs, and campaign data described herein remain in dispute and have received no explanation from opposing counsel in ninety days of briefing.*

Corrected Reply Brief at 14 (ECF No. 51).

The brief further stated that Appellant would retain all evidence documenting the billing contradictions and mathematical impossibilities described therein, and warned that if the migration rendered legacy records inaccessible, altered, or unrecoverable, millions of advertisers would have watched X Corp. destroy the documentary record while a federal court of appeals was in possession of the case.

## II. WHAT HAS OCCURRED

Six days later, on March 30, 2026, Appellant attempted to access the advertising records at issue in this appeal. The results are as follows:

**ads.x.com/manager** — X Corp's current advertising management interface loads an empty shell. The navigation elements render. No campaign data, billing records, or historical advertising information is displayed. The interface that previously contained the disputed billing records, impression data, and campaign histories documented in this appeal now shows nothing.

**analytics.twitter.com** — X Corp's legacy analytics platform returns a complete service outage page stating: "This page is down." No data of any kind is accessible.

**ads.twitter.com** — X Corp's legacy advertising platform returns a 503 server error. The service is entirely unavailable.

Advertising on the X platform continues to operate. Promoted posts appear in user feeds. X Corp's billing system continues to collect revenue from advertisers. The system that charges advertisers is running. The system that would allow advertisers to verify what they are being charged for is not.

### III. THE TIMELINE

The Court should consider the following chronology:

**Summer 2025:** Appellant identifies and documents billing anomalies in X Corp's advertising platform, including cumulative impression counts that decrease over time, charges on rejected campaigns, CSV exports contradicting dashboard displays, and devices running a 2010 mobile operating system appearing in billing records.

**October 2, 2025:** Appellant identifies X Corp employee accounts with administrative access to Appellant's advertising campaigns.

**October 13–17, 2025:** Three-stage systematic erasure of employee account identifiers from Appellant's ad history logs. The @AntSocializer account—identified by Appellant as having modified his paid advertising campaigns with backend administrative access—was renamed and its history redirected. As of the date of this filing, the @AntSocializer handle has been reestablished as a shell account with zero posts, zero followers, and zero following, displaying Appellant's own profile image as its avatar and the display name 'lolwut.'

3

**October 16, 2025:** X Corp files sworn denial of employee involvement during active, ongoing evidence destruction.

**October 27, 2025:** District court declares spoliation motions moot because destruction had already occurred.

**January 12, 2026:** Appellant's Opening Brief filed with this Court, documenting the billing anomalies and evidence destruction.

**February 2026:** X Corp's Response Brief filed. Billing anomalies, mathematical impossibilities, and evidence destruction receive no response across thirty pages of briefing.

**March 10, 2026:** Appellant files Corrected Reply Brief documenting the billing fraud in detail. Brief rejected for formatting—table of contents preceded table of authorities.

**March 24, 2026:** Appellant files second Corrected Reply Brief (ECF No. 51), including the warning about the impending ad platform migration. Within hours, X Corp restricts Appellant's account for "platform manipulation" with no specific conduct identified.

**March 25, 2026:** Scheduled ad platform migration occurs at midnight Pacific time.

**March 30–31, 2026:** Appellant confirms: ads.x.com/manager shows no historical data. analytics.twitter.com is down. ads.twitter.com returns 503 errors. Advertising continues to run on the platform. The billing system collects revenue. The records are gone.

## IV. THE RULE 37(e) IMPLICATIONS

Federal Rule of Civil Procedure 37(e) addresses the loss of electronically stored information that should have been preserved in the anticipation or conduct

of litigation. X Corp is not merely anticipating litigation. X Corp is a party to an active federal appeal in which these specific records are the disputed evidence. Opposing counsel has been on notice of the evidentiary significance of these records for over ninety days.

The district court previously declared spoliation moot because the destruction of employee account identifiers had already occurred. That ruling communicated to X Corp that evidence destruction during federal litigation carries no consequences. X Corp has now acted on that signal—not by destroying a single column in an ad history log, but by rendering the entire legacy advertising infrastructure inaccessible during the pendency of this appeal.

Appellant predicted this in a sworn filing. The prediction was specific: the migration would occur on March 25, 2026, and it would render the disputed records inaccessible. The prediction has proven accurate in every particular.

## V. FEDERAL COURTS HAVE CONSISTENTLY HELD THAT SYSTEM MIGRATIONS DO NOT EXCUSE SPOLIATION

X Corp cannot defend the destruction of these records as a routine system upgrade. Federal courts have repeatedly held that technology companies and corporations bear heightened preservation obligations when migrating systems containing evidence subject to litigation holds. Three recent cases are directly on point.

**United States v. Google LLC** (D.D.C. 2024). The Department of Justice sought sanctions against Google after discovering that Google had failed to suspend its automatic deletion of employee chat messages relevant to the government's antitrust monopoly claims—despite being on notice of the investigation. The court found that Google's routine data practices did not excuse the systematic destruction of relevant communications, and the DOJ argued the destruction warranted sanctions for the prejudice caused. The parallel is direct: a technology

company's standard business operations do not override a litigation hold, and a party that allows automated systems to destroy evidence it has a duty to preserve acts at its peril.

**Domus BWW Fund II, LLC v. Arch Insurance Co.** (E.D. Pa. 2024). During a corporate data migration, key witness emails were incorrectly tagged and deleted despite an active litigation hold. The court found prejudice to the opposing party and imposed curative sanctions. The court's reasoning is controlling here: a migration is not an excuse for destruction. When a party knows specific records are subject to a preservation obligation and proceeds with a system change that renders those records inaccessible, the migration is the mechanism of spoliation, not a defense against it.

**IKEA ADEA Class Action** (2024). IKEA's standard thirty-day deletion policy for former employee mailboxes destroyed relevant communications after notice of an age discrimination class action. The court found gross negligence and awarded attorney fees. The principle: routine business practices that a party knows will destroy relevant evidence after notice of litigation constitute spoliation regardless of whether the destruction was specifically targeted.

X Corp's conduct is materially worse than any of these cases. Google failed to suspend an auto-delete policy. IKEA failed to override a standard retention schedule. Domus involved a migration that inadvertently destroyed tagged records. In each case, the destruction was characterized as negligent or grossly negligent—a failure to act rather than an affirmative decision.

Here, by contrast, Appellant filed a sworn brief with this Court on March 24, 2026, specifically identifying the impending migration, specifically identifying the records at risk, and specifically warning that the migration would render disputed evidence inaccessible. X Corp proceeded anyway. This is not negligence. This is not inadvertence. This is the destruction of specifically identified evidence, during a pending federal appeal, after the opposing party warned the reviewing court it was about to happen. No case in this Court's

precedent has presented facts this stark.

## VI. COUNSEL'S OBLIGATIONS

X Corp's counsel of record—Ms. Norma N. Bennett of Shook, Hardy & Bacon, LLP and Mr. Kenneth Michael Trujillo-Jamison of Willenken LLP—have independent professional obligations regarding evidence preservation. Two possibilities exist, and the Court should require an explanation as to which applies:

> **Option A:** Counsel knew the ad platform migration would render disputed evidence inaccessible and did not inform this Court or take steps to ensure preservation. This constitutes a violation of counsel's duty to ensure client compliance with litigation holds and is independently sanctionable.

> **Option B:** Counsel did not know their client was migrating the platform containing the disputed evidence during a pending appeal. If so, X Corp acted without informing its litigation counsel about actions directly affecting evidence in active federal proceedings. Counsel's obligation at this point is to investigate immediately and report to this Court. Silence from this point forward converts "did not know" into "chose not to find out."

There is no third option in which no one bears responsibility for the destruction of specifically identified evidence during active federal appellate proceedings.

## VII. THE SCALE OF DESTRUCTION

Appellant's Corrected Reply Brief documented billing anomalies specific to Appellant's account: cumulative impression counts that decrease, charges on rejected campaigns, CSV exports contradicting dashboard displays, and devices

from 2010 appearing in modern billing records. If those anomalies existed in Appellant's account, they may exist across the platform. The legacy advertising infrastructure that is now inaccessible contained the billing records of every advertiser who has ever used the platform.

The scale of what has been rendered inaccessible warrants precision. In 2022—the last full year before X Corp ceased public financial reporting following its acquisition—the platform generated approximately $4.7 billion in global advertising revenue. By 2023, that figure had declined to approximately $2.5 billion. In 2024, X Corp generated approximately $2.5 billion in total revenue, of which sixty-eight percent—approximately $1.7 billion—came from advertising. Even accepting the most conservative figures, the advertising infrastructure that is now inaccessible processed billions of dollars in charges to advertisers across multiple years. The billing records that would allow those advertisers to verify what they were charged, what was delivered, and whether the two corresponded are the records that no longer exist in any accessible form.

X Corp did not destroy one litigant's records. X Corp rendered inaccessible the entire audit trail for its advertising revenue—during a federal appeal about advertising fraud—while continuing to bill advertisers through the system those records would audit. The billing engine runs. The receipts are gone.

This Court should consider what any person, without knowledge of the parties or their counsel, would conclude from the following sequence of facts:

A company is sued for copyright infringement and billing fraud. The court finds infringement plausible but does not order it to stop. The plaintiff files emergency motions. They go unanswered for seven months. The company requests extensions of time. They are granted. The company destroys evidence. The court declares the destruction moot. The company files contradictory sworn statements. The court accepts both. The plaintiff documents billing records showing mathematical impossibilities. The company does not respond. The plaintiff warns the court that the company is about to destroy the remaining

evidence. Six days later, the records are gone. The company continues to collect advertising revenue through the system that no one can now audit. The plaintiff is dismissed for tone.

No specialized knowledge is required to evaluate that sequence. No legal training is necessary to identify what occurred. Any observer would reach the same conclusion: something has gone fundamentally wrong, and the system that was designed to prevent it did not function. The only question is whether that malfunction was incidental or structural. The record, taken as a whole, does not support incidental.

There is a further point the Court should weigh. The destroyed records were not merely relevant evidence. They were X Corp's single most powerful defense. Appellant's briefing alleges that billing anomalies—cumulative metrics that decrease, charges on rejected campaigns, contradictions between CSV exports and dashboard displays—indicate systemic advertising fraud. If those anomalies were isolated to Appellant's account—a one-off glitch, a display error, an aberration—the platform-wide billing records would prove it. A single audit demonstrating that no other advertiser's account exhibited the same patterns would end the fraud allegation entirely. Those records were the answer to Appellant's claims. X Corp destroyed the answer.

An innocent party preserves exculpatory evidence. An innocent party says: examine everything. An innocent party whose billing system is clean opens the books and lets the numbers speak. X Corp had ninety days of appellate briefing in which the billing anomalies were identified, documented, and presented to this Court. X Corp's response brief did not address them. X Corp did not produce a single record, a single audit, or a single explanation demonstrating that the anomalies were isolated. Instead, X Corp migrated the platform that contained those records—six days after Appellant warned this Court it would happen—and the records are now inaccessible.

X Corp is one of the largest technology companies on Earth. X Corp operates its own artificial intelligence infrastructure. X Corp possesses the engineering capacity to migrate, back up, and restore data at computational speed. If this migration preserved the disputed records in accessible form, X Corp could have said so immediately. X Corp has not. If the records can be restored to their pre-migration state, X Corp could demonstrate that now. X Corp has not. And even if restoration occurs at this point, the chain of custody has been broken. No court and no auditor can verify that records produced after a migration during active litigation are identical to the records that existed before it. The evidentiary value of the original records has been permanently destroyed regardless of what X Corp produces going forward.

The preservation obligation extends beyond this appeal. Appellant's Opening Brief stated explicitly that post-dismissal conduct—including the ongoing copyright infringement, the continued impersonation, and the systematic account restrictions—would be pursued in the District of Nebraska if this Court did not reverse. Appellant's Corrected Reply Brief reiterated that the cause of action remains available to be refiled, that the copyright registration is still valid, and that the impersonator account was never removed. X Corp has been on notice since January 2026 that additional litigation was anticipated regardless of the outcome of this appeal. Under Rule 37(e), the duty to preserve attaches when litigation is reasonably anticipated. X Corp did not merely anticipate it. X Corp was told, in a federal filing, that it was coming—and that the billing records would be central to those claims. X Corp destroyed those records anyway. The destruction is not limited to spoliation in this proceeding. It is preemptive destruction of evidence X Corp knew would be used against it in litigation it had been expressly warned was forthcoming.

The inference is not subtle. The records that would have answered the fraud allegation were destroyed by the party the allegation targets, during the proceeding in which the allegation was raised, after the opposing party warned the reviewing court it was about to happen, and after ninety days in which the

party could have produced those records to end the dispute. The destruction of one's own best defense is not the conduct of a party with nothing to hide. It is the strongest available evidence that the records contained exactly what Appellant said they contained.

## VIII. THE PATTERN AND ITS CONSEQUENCES

This Court should consider the full arc of what has occurred—not as a series of isolated procedural events, but as a pattern in which every request by Appellant was denied, ignored, or declared moot, every request by X Corp was granted, and each successive round of institutional inaction enabled the next round of evidence destruction, until nothing remains for any court to review.

The district court found contributory copyright infringement plausible. That finding meant the court believed it was plausible that X Corp was helping someone else infringe Appellant's federal copyright. The single action that finding required—the one thing that logically and legally followed from it—was an order requiring the infringing content to come down while the case proceeded. No such order issued. The content remained active for over eight hundred days. That was the first decision point.

Appellant filed emergency motions regarding unauthorized account access and ongoing harassment—including an account using Appellant's legal name, his federally registered photograph, and his wife's image to direct hostile strangers toward Appellant. Those motions went unanswered for seven months. During that same seven months, X Corp requested and received extensions of time to respond to the claims Appellant's emergency motions documented. The court had time to grant X Corp's requests. It did not have time to read Appellant's.

X Corp employee accounts appeared in Appellant's advertising administrative logs. X Corp filed a sworn denial of employee involvement that was contradicted by X Corp's own 'Affiliated with X' badge on the identified

account. X Corp then destroyed the account identifiers in three stages while the sworn denial was pending. Appellant filed spoliation motions within days. The district court declared the spoliation moot because the destruction had already occurred. The message to X Corp was unambiguous: destroy evidence quickly enough and the motion addressing it arrives too late to matter.

X Corp swore forty-seven times in its Answer that it lacked knowledge of its own billing systems, DMCA procedures, and operational infrastructure—the same systems it had described in comprehensive detail months earlier to achieve partial dismissal. The district court accepted both sworn positions without comment. X Corp later requested and received additional time for appellate briefing. When Appellant exceeded page limits attempting to document the mounting contradictions, the case was dismissed with prejudice.

The asymmetry is total. X Corp's requests for extensions: granted. Appellant's emergency motions: ignored for seven months. X Corp's contradictory sworn statements: accepted without analysis. Appellant's table of contents appearing before the table of authorities: brief rejected, resubmission required. X Corp's evidence destruction: declared moot. Appellant's page limit violations while documenting that destruction: dismissed with prejudice. Not one procedural ruling across the entire litigation favored Appellant. Not one.

And the structural effect of this asymmetry is self-reinforcing. Each new act of misconduct by X Corp requires a new filing to document it. Each new filing is attributed to Appellant as excessive or burdensome litigation conduct. The more X Corp does, the more Appellant must file, and the more Appellant files, the more the court characterizes Appellant as the problem. X Corp's misconduct becomes, through this mechanism, Appellant's tone. The party committing the acts faces no consequences. The party documenting them is dismissed for documenting too many.

The district court evaluated Appellant's tone without ever evaluating what Appellant was responding to. The conduct that produced Appellant's tone

included: an account using Appellant's legal name and federally registered photograph to direct hostile strangers toward him; a sworn denial contradicted by X Corp's own badge; three-stage evidence destruction during litigation; seven months of silence on emergency motions; and an account bearing Appellant's own image with the display name 'lolwut' appearing on the handle of the very account Appellant identified as having unauthorized access to his advertising campaigns. The district court's tolerance of that conduct established the threshold for what was acceptable in this litigation. A reasonable litigant observing that threshold would conclude that his own expressions of urgency fell well within it. Dismissing Appellant for a tone calibrated to an environment the court itself created by its own inaction is not the application of a standard. It is the selective enforcement of an undefined one.

Billing records showed cumulative impression counts that decreased over time, charges on campaigns X Corp's own systems showed as rejected, CSV exports contradicting dashboard displays for the same campaigns, and devices running a mobile operating system released in 2010 appearing in current records. X Corp received ninety days of appellate briefing identifying these anomalies. Their response brief did not mention them. No court required an explanation.

Appellant filed a sworn brief with this Court on March 24, 2026, warning that X Corp's ad platform was scheduled to migrate that night—rendering the disputed billing records inaccessible. Within hours of that filing, X Corp restricted Appellant's account. Six days passed. No court acted on the warning. The migration occurred. The records are now gone.

The pattern is not complicated. When Appellant needed the system to function, it did not. When X Corp needed the system to function, it did. Each instance of selective inaction communicated to X Corp that there would be no consequences for the next escalation. The district court's mootness ruling told X Corp that completed destruction carries no penalty. X Corp heard that message clearly. The result is what this notice documents: the entire legacy advertising infrastructure—containing the billing records of every advertiser who has ever

used the platform—rendered inaccessible during a pending federal appeal about the contents of those records.

Appellant is not asking this Court to accept a characterization. Appellant is asking this Court to look at the sequence—the finding of plausible infringement with no removal order, the seven months of silence on emergency motions while extensions were granted to opposing counsel, the ratified spoliation, the accepted contradictory sworn statements, the ninety days of unanswered billing anomalies, the brief rejected for table of contents order while evidence destruction went unaddressed, the six days of inaction after a sworn warning—and determine whether the cumulative result is acceptable. Because the cumulative result is that a pro se litigant documented what may be systemic advertising fraud, told every court involved exactly what was happening, was correct each time, and watched the evidence disappear while no institution with the power to act chose to do so.

No legislature that enacted the Copyright Act, the DMCA, or the Federal Rules of Civil Procedure contemplated that the tone of a single self-represented litigant would operate as a free pass for one of the world's largest corporations to commit what the record now suggests may be billions of dollars in advertising fraud. The billing anomalies documented in Appellant's briefing—if they exist platform-wide, as the systemic destruction of the audit trail suggests—affect every advertiser who has ever paid for services on the platform. The system's response to the one person who found it, documented it, and was willing to pursue it has been to dismiss the case because that person expressed the level of concern that the findings warranted. Whatever tone Appellant exhibited, the record does not reflect that it was disproportionate to what he was responding to. It reflects that it was inconvenient.

That is the record. It does not require characterization. It requires only that someone read it.


## IX. WHY THIS NOTICE NECESSITATES ORAL ARGUMENT

X Corp's counsel has billed on this case for over a year. Across that time, counsel has filed briefs, requested and received extensions, opposed Appellant's motions, and argued that the dismissal below should be affirmed. At no point has counsel been required to answer a single question out loud, on the record, before a panel of this Court.

That must change. The events documented in this notice cannot be resolved on paper. This Court must hear, from X Corp's counsel directly, under questioning:

• Whether counsel was informed prior to March 25, 2026, that X Corp intended to migrate its advertising platform—rendering the disputed billing records inaccessible—during a pending federal appeal in which those records are central evidence.

• If counsel was informed, why counsel did not notify this Court or take steps to ensure preservation of specifically identified evidence.

• If counsel was not informed, what that failure of communication reveals about X Corp's approach to its litigation obligations—and whether counsel can continue to represent to this Court that X Corp's conduct has been in good faith.

• Why X Corp's response brief did not address the billing anomalies, the mathematical impossibilities, the missing counter-notices, the sworn denial contradicted by X Corp's own badge, or the three-stage evidence destruction—despite ninety days of briefing.

• What immunity theory remains available to X Corp after Section 230 is excluded by its own text from copyright claims, DMCA safe harbor has been forfeited through non-compliance, and the First Amendment does not protect copyright infringement.

These questions have been presented in writing across three briefs and multiple supplemental filings. X Corp's counsel has not answered any of them. The reason is not that the questions are difficult to understand. The reason is that they cannot be answered in writing without creating a record that counsel must then live with. A brief can decline to address an argument. A panel asking a direct question cannot be declined.

X Corp declined to request oral argument. The inference is available: a party that built its defense around Appellant's purported inability to conduct himself professionally chose to waive the one proceeding where that inability would be demonstrated. And a party whose counsel has never been required to explain—out loud, in real time, under direct questioning—why disputed evidence was destroyed during a pending appeal has never been required to confront the possibility that no explanation exists.

This case has proceeded from filing through dismissal through appeal without a single court requiring X Corp to answer a single substantive question in any setting where the answer could not be drafted, revised, and sanitized by counsel before delivery. Appellant has been told his tone is the problem. Appellant has been told his page counts are the problem. Appellant has been told his table of contents order is the problem. At no point has any court required the opposing party to explain, under oath, in real time, why math goes backward, why a sworn denial was contradicted by its own badge, why eight DMCA notices produced zero counter-notices, or why the entire advertising platform was migrated six days after a federal filing warned this Court it would happen.

If the answers to these questions are as straightforward as X Corp's briefing suggests, oral argument will demonstrate that. If the answers are not straightforward—if counsel cannot explain the evidence destruction, the billing contradictions, or the ninety days of silence on documented anomalies—then oral argument will demonstrate that as well. Either way, the record will finally contain something it has never contained: X Corp's counsel answering a question they did not choose.

# X. RELIEF REQUESTED

Appellant respectfully requests that this Court:

1. Order X Corp to show cause within seven days why sanctions should not be imposed under Rule 37(e)(2) for destruction of specifically identified evidence during a pending federal appeal;

2. Order X Corp's counsel to file a declaration within seven days stating (a) whether counsel was informed of the ad platform migration prior to its execution, (b) what steps, if any, counsel took to ensure preservation of the disputed records, and (c) the current status and accessibility of the billing records, ad history logs, and campaign data identified in Appellant's briefing;

3. Order X Corp to restore or produce all legacy advertising records, billing data, campaign histories, and ad history logs that were accessible prior to the March 25, 2026 migration;

4. Draw the adverse inference under Rule 37(e)(2) that the destroyed records contained evidence establishing the billing anomalies and advertising fraud documented in Appellant's briefing;

5. Schedule oral argument at which X Corp's counsel shall be required to address, under direct questioning by the panel: the destruction of the advertising platform records during this appeal; counsel's knowledge of and role in the migration; the billing anomalies identified in Appellant's briefing that counsel's response brief did not address; and the remaining immunity theory available to X Corp after Section 230's exclusion of copyright claims, DMCA safe harbor forfeiture, and the First Amendment's inapplicability to copyright infringement;

6. Issue a reasoned order addressing the substantive arguments presented in this motion and in Appellant's briefing on the merits. No court at any level in this litigation has issued a substantive ruling engaging with the evidence, the legal arguments, or the documented contradictions in X Corp's sworn filings. Every comparable case involving platform liability, DMCA compliance, or evidence spoliation that has reached a federal appellate court has received substantive analysis. This case has received none. Appellant respectfully submits that a case presenting questions of this significance warrants, at minimum, the same substantive engagement that any litigant represented by counsel would receive as a matter of course; and

7. Consider whether the pattern of evidence destruction—first the employee account identifiers in October 2025, declared moot by the district court, and now the entire legacy advertising infrastructure in March 2026—warrants referral to the appropriate authorities under 18 U.S.C. § 1519 for destruction of records in connection with federal proceedings.

## DECLARATION UNDER PENALTY OF PERJURY

I, Justin Riddle, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements regarding the current inaccessibility of X Corp's advertising platform data are true and correct based on my direct observation on March 31, 2026. I have retained screenshots documenting the empty ads manager interface, the analytics.twitter.com outage page, and the ads.twitter.com 503 error. I have also retained a video recording in excess of ten minutes documenting my attempts to access any advertising data through both the legacy and current platforms, including the new analytics system, which returns an error and displays no data. The video demonstrates that every available path to the disputed records—legacy and current—has been exhausted and produces no results.

Respectfully submitted,

/s/ Justin Riddle

JUSTIN RIDDLE, Pro Se Appellant

Tel: (402) 813-2156

Email: justinriddle1@gmail.com

March 31, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, the foregoing document was served electronically via the Court's CM/ECF system on all counsel of record, including:

Ms. Norma N. Bennett: nbennett@shb.com

Mr. Kenneth Michael Trujillo-Jamison: ktrujillo-jamison@willenken.com


/s/ Justin Riddle
JUSTIN RIDDLE, Pro Se Appellant