

707 Wilshire Blvd.
Suite 4100
Los Angeles, CA 90017

TEL  213.955.9240
FAX  213.955.9250

willenken.com

April 22, 2026

<u>**VIA ECF ONLY**</u>

Lyle W. Cayce
Clerk of Court
United States Court of Appeals for the Fifth Circuit
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408
Tel.: (504) 310-7700

Re:   *Riddle v. X Corp.*, No. 25-50951
      Defendant-Appellee X Corp.'s Letter re Supplemental Authority
      <u>Under Federal Rule of Appellate Procedure 28(j)</u>

Dear Mr. Cayce,

Defendant-Appellee X Corp. ("X Corp.") respectfully submits this notice of supplemental authority about two Supreme Court decisions issued after X Corp. filed its brief: (1) *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959 (Mar. 25, 2026) ("*Cox*"); and (2) *Grande Communications Networks v. UMG Recordings, Inc.*, No. 24-967, 2026 WL 922501, at *1 (U.S. Apr. 6, 2026) ("*Grande*").

Below, the district court held that Plaintiff-Appellant Justin Riddle ("Riddle") "plausibly alleged contributory [copyright] infringement," relying on this Court's opinion in *UMG Recordings, Inc. v. Grande Communications Networks*, 118 F.4th 697 (5th Cir. 2024) ("*UMG*"). ECF No. 47 at 7–8; ROA.1247–48. There, this Court determined that "material contribution may be found where an ISP [*i.e.*, an internet service provider] knew of specific instances of repeated infringement by



specific users and chose to continue providing services to them . . . ." ROA.1247 (citation modified).[1]

In *Cox*, the Supreme Court held that an ISP may be liable under a contributory copyright infringement theory only if the ISP "intended that the provided service be used for infringement" by inducing infringement through affirmative acts or by providing a service incapable of substantial non-infringing uses. 146 S. Ct. at 967. In *Grande*, issued after *Cox*, the Supreme Court vacated *UMG* and remanded the case for further consideration.

Under *Cox*, Riddle fails to state his contributory infringement claim because his allegations that "he submitted four DMCA takedown notices to X Corp. that '[s]pecifically identified the infringing content and accounts,' but that 'X Corp. failed to take any meaningful action to address the infringement,'" ROA.1248, fail to show that X Corp. intended that X, its social media platform, "be used for infringement." *See Cox*, 146 S. Ct. at 967. Accordingly, *Cox* provides an independent basis to affirm the district court's judgment. Furthermore, because the Supreme Court vacated *UMG*, that opinion no longer supports Riddle's claim.

Respectfully submitted,

*/s/ Kenneth M. Trujillo-Jamison*

Kenneth M. Trujillo-Jamison

Attachments

---

[1] The district court later dismissed Riddle's case with prejudice "due to Plaintiff's repeated improper filings, failure to comply with local rules, and threatening and harassing conduct." ROA.2084–89. The district court never considered the impact of *Cox* on Riddle's claim.



Lyle W. Cayce
April 22, 2026
Page 3

cc:  Mr. Justin Riddle (via ECF)
     Ms. Norma J. Bennett (via ECF)



707 Wilshire Blvd., Suite 4100, Los Angeles, CA 90017
TEL 213.955.9240  FAX 213.955.9250   willenken.com

# TAB A

146 S.Ct. 959

Supreme Court of the United States.

COX COMMUNICATIONS, INC., et al., Petitioners

v.

SONY MUSIC ENTERTAINMENT, et al.

No. 24–171

|

Argued December 1, 2025

|

Decided March 25, 2026

**Synopsis**

**Background:** Copyright owners brought action against internet service provider (ISP) for vicarious and contributory copyright infringement. Following jury trial, the United States District Court for the Eastern District of Virginia, Liam O'Grady, J., 464 F.Supp.3d 795, denied in part ISP's post-trial motion for judgment as a matter of law and entered judgment in favor of copyright owners. ISP appealed. The United States Court of Appeals for the Fourth Circuit, Rushing, Circuit Judge, 93 F.4th 222, affirmed as to contributory liability, but reversed as to vicarious liability, vacated damages award, and remanded for reassessment of damages. ISP's petition for writ of certiorari as to contributory liability was granted.

**Holdings:** The Supreme Court, Justice Thomas, held that:

ISP's knowledge of its users' infringement and failure to terminate service to their accounts was insufficient to support contributory liability; abrogating *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293;

ISP did not induce infringement by its users; and

ISP did not provide service tailored to infringement.

Reversed and remanded.

Chief Justice Roberts and Justices Alito, Kagan, Gorsuch, Kavanaugh, and Barrett joined.

Justice Sotomayor filed opinion concurring in the judgment, in which Justice Jackson joined.

**Procedural Posture(s):** Petition for Writ of Certiorari; On Appeal; Judgment.

*Syllabus*[*]

Under the Copyright Act, "[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright." 17 U.S.C. § 501(a). This Court has also recognized two categories of secondary liability, which means liability for the copyright infringement of another. Those two categories are "contributory" liability and "vicarious" liability. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781.

This case concerns contributory liability, which requires that a provider intended its service to be used for infringement. A copyright owner can show the requisite intent in two ways. First, it can show that a party affirmatively induced the infringement. *Ibid.* Second, it can show that the party sold a service tailored to infringement. *Id.*, at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring). These two bases for contributory liability track patent law. See 35 U.S.C. §§ 271(b), (c).

Cox Communications, Inc., is an Internet service provider serving approximately six million subscribers, each associated with a unique Internet Protocol address. Internet service providers like Cox have limited knowledge about how their services are used; they know which IP address corresponds to which subscriber account but cannot distinguish individual users or directly control how services are used. Cox contractually prohibits subscribers from using their connection to post, copy, transmit, or disseminate content that infringes copyrights.

Sony Music Entertainment and other major music copyright owners enlisted MarkMonitor to track copyright infringement across the Internet. MarkMonitor's software detects when copyrighted works are illegally uploaded or downloaded and traces the activity to particular IP addresses. During the roughly two-year period at issue, MarkMonitor sent Cox 163,148 notices identifying IP addresses of Cox subscribers associated with infringement.

Sony sued Cox in Federal District Court, advancing two theories of secondary copyright liability. First, Sony alleged that Cox contributed to its users' infringement by continuing to provide Internet service to subscribers whose IP addresses Cox knew were associated with infringement. Second, Sony alleged that Cox was vicariously liable for its users' infringement. The jury found in favor of Sony on both theories, found Cox's infringement willful, and awarded $1 billion in statutory damages. The District Court denied Cox's post-trial motion for judgment as a matter of law in relevant part. The Fourth Circuit affirmed as to contributory liability, reasoning that supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement. The Fourth Circuit reversed as to vicarious liability. This Court granted Cox's petition for certiorari as to contributory liability.

*Held*: The provider of a service is contributorily liable for a user's infringement only if it intended that the provided service be used for infringement, which can be shown only if the party induced the infringement or the provided service is tailored to that infringement; Cox neither induced its users' infringement nor provided a service tailored to infringement; accordingly, Cox is not contributorily liable for the infringement of Sony's copyrights. Pp. 966 - 969.

(a) "The Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 434, 104 S.Ct. 774, 78 L.Ed.2d 574. Ordinarily, when Congress intends to impose secondary liability, it does so expressly. *Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 176–177, 114 S.Ct. 1439, 128 L.Ed.2d 119. The Court's precedents have recognized specific forms of secondary copyright liability that predated the Copyright Act, but the Court is loath to expand such liability beyond those precedents.

Under this Court's precedents, the intent required for contributory liability can be shown only if the party induced the infringement or the provided service is tailored to that infringement. See *Grokster*, 545 U.S., at 930, 125 S.Ct. 2764; *Sony*, 464 U.S., at 440–441, 104 S.Ct. 774.

A provider induces infringement if it actively encourages infringement through specific acts, as in *Grokster*, where file-sharing software companies promoted and marketed their software as a tool to infringe copyrights. See 545 U.S., at 926, 125 S.Ct. 2764. A service is tailored to infringement if it is "not capable of 'substantial' or 'commercially significant' noninfringing uses." *Id.*, at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring). For example, in *Sony*, the Court held that sale of the Betamax video tape recorder to the general public did not constitute contributory infringement. It reasoned that the tape recorder was "capable of substantial noninfringing uses" because it could be used to record copyrighted television programs for later personal viewing, which would not constitute infringement—even though it could also be used to reproduce and sell copyrighted programming, which would constitute infringement. 464 U.S., at 449, 456, 104 S.Ct. 774. The Court has repeatedly made clear—see *Kalem*

*Co. v. Harper Brothers,* 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92, *Sony,* and *Grokster*—that mere knowledge that a service will be used to infringe is insufficient to establish the required intent to infringe. Pp. 966 - 968.

(b) Cox neither induced its users' infringement nor provided a service tailored to infringement. As for inducement, Cox did not "induce" or "encourage" its subscribers to infringe in any manner, *Grokster,* 545 U.S., at 930, 125 S.Ct. 2764; Sony provided no "evidence of express promotion, marketing, and intent to promote" infringement, *id.,* at 926, 125 S.Ct. 2764; and Cox repeatedly discouraged copyright infringement by sending warnings, suspending services, and terminating accounts. As for providing a service tailored to infringement, Cox's Internet service was clearly "capable of 'substantial' or 'commercially significant' noninfringing uses," *id.,* at 942, 125 S.Ct. 2764; Cox simply provided Internet access, which is used for many purposes other than copyright infringement.

The Fourth Circuit's holding went beyond the two forms of liability recognized in *Grokster* and *Sony* by holding that "supplying a product with knowledge that the recipient will use it to infringe copyrights is ... sufficient for contributory infringement." 93 F.4th 222, 236. This holding went beyond the two bases for contributory liability recognized in the Court's precedent and conflicted with the Court's repeated admonition that contributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it. Pp. 968 - 969.

(c) Sony argues that the Digital Millennium Copyright Act safe harbor—under which Internet service providers cannot be secondarily liable for certain forms of copyright infringement if they have implemented "a policy that provides for the termination in appropriate circumstances of subscribers and account holders" who "are repeated infringers," 17 U.S.C. § 512(i)(1)(A)—would have no effect if Internet service providers are not liable for providing Internet service to known infringers. The DMCA does not expressly impose liability for Internet service providers who serve known infringers; it merely creates new defenses from liability for such providers. The DMCA itself made clear that failure to comply with the safe-harbor rules "shall not bear adversely upon ... a defense by the service provider," as here, "that the service provider's conduct is not infringing." § 512(*l*). P. 969.

93 F.4th 222, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which JACKSON, J., joined.

Case below, 93 F.4th 222.

**Attorneys and Law Firms**

E. Joshua Rosenkranz, New York, NY, for Petitioners.

Malcolm L. Stewart, Deputy Solicitor General, for United States, as amicus curiae, supporting petitioners.

Paul D. Clement, Alexandria, VA, for Respondent.

Edward Williams, Abigail Colella, Kamilyn Y. Choi, Orrick, Herrington & Sutcliffe LLP, Washington, DC, Roman Martinez, Sarang V. Damle, Brent T.F. Murphy, Latham & Watkins LLP, Washington, DC, E. Joshua Rosenkranz, Counsel of Record, Christopher J. Cariello, Alexandra Bursak, Gavin McGimpsey, Orrick, Herrington & Sutcliffe LLP, New York, NY, for Petitioners.

Matthew J. Oppenheim, Scott A. Zebrak, Jeffrey M. Gould, Oppenheim * Zebrak, LLP, Washington, DC, Paul D. Clement, Counsel of Record, Erin E. Murphy, Kevin Wynosky, Clement & Murphy, PLLC, Alexandria, VA, for Respondents.

**Opinion**

Justice THOMAS delivered the opinion of the Court.

 **\*964** Countless people use the Internet for legal activities, but some use it to illegally share copyrighted works, such as songs and movies. The Copyright Act authorizes copyright owners to sue these copyright infringers. 17 U.S.C. §§ 501(a), 504(a). In this case, however, instead of suing those infringers, the copyright owners sued petitioners, Cox Communications, Inc., and its subsidiary, who provided the Internet connections that the infringers used. They contended that Cox was itself liable for copyright infringement because it continued to provide known infringers with Internet access.

Based on this theory of infringement, respondents, Sony Music Entertainment and other major copyright owners, secured a billion-dollar verdict against Cox. The United States Court of Appeals for the Fourth Circuit agreed that because Cox provided Internet service to known infringers, it was a willful infringer itself.

Under our precedents, a company is not liable as a copyright infringer for merely providing a service to the general public with knowledge that it will be used by some to infringe copyrights. Accordingly, we reverse.

I

A

Under the Copyright Act, copyright owners have the exclusive rights to copy, distribute, and digitally transmit their copyrighted works. § 106. So, for example, if a musician has a copyright for a song recording, others generally cannot copy and share that recording without the musician's permission. The Copyright Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright." § 501(a). A willful infringer faces statutory damages of up to $150,000 per work. § 504(c)(2).

This Court has also recognized two categories of secondary copyright liability, which means liability for the copyright infringement of another. Those two categories are "contributory" liability and "vicarious" liability. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005). This case concerns contributory liability.

The provider of a service is contributorily liable for a user's infringement if it intended its service to be used for infringement. To establish that a provider intended its service to be used for infringement, a copyright owner must show one of two things. First, it can show that a party affirmatively "induc[ed]" the infringement. *Ibid.* Or, second, it can show that the party sold a service tailored to infringement. *Id.*, at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring). Patent law, with which copyright law has a "historic kinship," *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 439, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), tracks these two requirements. See 35 U.S.C. §§ 271(b), (c).

In 1998, Congress passed the Digital Millennium Copyright Act, **\*965** 17 U.S.C. § 1201 *et seq.*, which gave service providers a safe-harbor defense to secondary copyright liability. Under the DMCA safe-harbor defense, service providers cannot be secondarily liable for certain forms of copyright infringement if they have implemented "a policy that provides for the termination in appropriate circumstances of subscribers and account holders" who "are repeated infringers." § 512(i)(1)(A). At the same time, the DMCA specifies that failure to qualify for the safe-harbor defense "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing." § 512(*l*).

B

Cox Communications, Inc., is an Internet service provider that serves about 6 million subscribers. Each subscriber's account is associated with a unique Internet Protocol, or "IP," address. Many users can share a particular IP address. For example, a household, coffee shop, or college dormitory ordinarily has one IP address, but has multiple individual users.

Internet service providers, such as Cox, have limited knowledge about how their Internet services are used and who uses them. They do know which IP address corresponds to which subscriber's account, but they cannot distinguish one individual user from another. For instance, if an Internet service provider learns that someone illegally downloaded music from a coffee shop's IP address, the Internet service provider cannot determine which individual at the coffee shop infringed the copyright. And, more generally, Internet service providers also cannot directly control how their Internet services are used.

Sony Music Entertainment and the other plaintiffs in this case are major music copyright owners. They have struggled to protect their copyrights in the age of online music sharing. Today, anyone with an Internet connection and easily obtained software can upload digital copies of copyrighted music and make them available for others to down-load. This practice often infringes the owners' exclusive rights to copy and distribute their works. §§ 106(1), (3). Copyright owners can, and do, sue the individuals who infringe their copyrights in this manner. See, *e.g.*, *Sony BMG Music Entertainment v. Tenenbaum*, 660 F.3d 487, 490 (CA1 2011). However, because online infringement is so widespread, pursuing each individual infringer does little to stem the tide.

Given the difficulty of pursuing individual infringers, Sony attempted to enlist Internet service providers such as Cox to help it enforce its copyrights. It enlisted the services of an entity called MarkMonitor to track infringement of its copyrights across the Internet. MarkMonitor's software can detect when copyrighted works are illegally uploaded or downloaded and trace the infringing activity to a particular IP address. It can also identify the Internet service provider for the infringing IP address. When MarkMonitor detects apparently infringing activity, it sends notices to the Internet service provider, identifying the IP address at which the infringement occurred. In the roughly 2-year period at issue here, MarkMonitor sent Cox 163,148 such notices.

Cox states that it took steps to limit copyright infringement by those using its Internet services. According to Cox, it created a system of responding to the notices that it received from MarkMonitor. After the second MarkMonitor notice for a subscriber's account, Cox sent a warning to that subscriber. After additional notices, Cox terminated Internet access to that subscriber's IP address until the subscriber responded to the warning. If it continued to receive notices for that IP address, **\*966** Cox suspended service until the subscriber called and received a warning over the phone. After 13 notices, the subscriber was subject to termination of all Internet service. Cox also contractually prohibits its subscribers from using their connection "to post, copy, transmit, or disseminate any content that infringes the patents, copyrights ... or proprietary rights of any party." 2 App. 405.

The parties disagree about how to characterize Cox's efforts to protect Sony's copyrights. Sony points out that Cox terminated only 32 subscribers for infringement during the claim period, even as it terminated hundreds of thousands of subscribers for nonpayment during the same period. Brief for Respondents 18. Sony also points to statements from Cox employees expressing frustration with the notices and an unwillingness to act on them in favor of protecting revenue from subscriber payments. *Id*., at 22. Cox resists this characterization by pointing out that its warning and suspension system ended 98% of identified infringement. Brief for Petitioners 10–11.

C

Sony sued Cox in the United States District Court for the Eastern District of Virginia. It advanced two theories of secondary copyright liability.

First, Sony alleged that Cox was contributorily liable for its users' infringement. Sony argued that Cox contributed to its users' infringement by continuing to provide Internet service to subscribers whose IP addresses it knew were associated with infringement. Second, Sony alleged that Cox was vicariously liable for its users' infringement. On Sony's telling, Cox "profit[ed] directly from the infringement and ha[d] a right and ability to supervise the direct infringer[s]," *Grokster*, 545 U.S., at 930, n. 9, 125 S.Ct. 2764, because it provided paying subscribers with Internet service that was then used to infringe. According to Sony's allegations, Cox was liable for willfully infringing 10,017 copyrighted works, subjecting it to up to $1.5 billion in statutory damages.

In the District Court, Sony prevailed as to both contributory and vicarious liability. The jury found in favor of Sony on both theories. 464 F.Supp.3d 795, 807–808 (ED Va. 2020). It also found that Cox's infringement was willful, awarding $1 billion in statutory damages. *Ibid.* The District Court denied Cox's post-trial motion for judgment as a matter of law in relevant part. *Id.*, at 847. [*]

The Fourth Circuit affirmed in part and reversed in part. It affirmed as to contributory liability because Cox continued to provide Internet service to known infringers. Applying Circuit precedent, it reasoned that "supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement." 93 F.4th 222, 236 (2024) (citing *BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 308 (2018)). The Fourth Circuit reversed as to vicarious liability because it concluded that Cox did not "receiv[e] a direct financial benefit from its subscribers' infringement." 93 F.4th at 233. The court then vacated the damages award and remanded for the jury to reassess damages based on contributory liability alone.

**\*967** We granted Cox's petition for a writ of certiorari as to contributory liability. 606 U. S. 930, 145 S.Ct. 2841, 222 L.Ed.2d 1128 (2025). We denied Sony's petition for a writ of certiorari regarding vicarious liability. 606 U. S. 931, 145 S.Ct. 2844, 222 L.Ed.2d 1130 (2025).

II

A

"The Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony*, 464 U.S., at 434, 104 S.Ct. 774. Ordinarily, when Congress intends to impose secondary liability, it does so expressly. See *Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 176–177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Although our precedents have recognized specific forms of secondary copyright liability that predated the Copyright Act, we are loath to expand such liability beyond those precedents.

B

The provider of a service is contributorily liable for the user's infringement only if it intended that the provided service be used for infringement. The intent required for contributory liability can be shown only if the party induced the infringement or the provided service is tailored to that infringement. *Grokster*, 545 U.S., at 930, 125 S.Ct. 2764; *Sony*, 464 U.S., at 440–441, 104 S.Ct. 774.

A provider induces infringement if it actively encourages infringement through specific acts. *Grokster*, 545 U.S., at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring). For example, in *Grokster*, we held that a jury could find two file-sharing software companies liable for inducement. *Id.*, at 941, 125 S.Ct. 2764 (majority opinion). The companies promoted and marketed their software as a tool to infringe copyrights. *Id.*, at 926, 125 S.Ct. 2764. The "principal object" of their business models "was use

of their software to download copyrighted works." *Ibid*. Other decisions have held providers liable for similar conduct. See *Kalem Co. v. Harper Brothers*, 222 U.S. 55, 62–63, 32 S.Ct. 20, 56 L.Ed. 92 (1911) (finding liability where "[t]he defendant not only expected but invoked by advertisement the use of its films" for infringement of an author's copyright); *Henry v. A. B. Dick Co.*, 224 U.S. 1, 49, 32 S.Ct. 364, 56 L.Ed. 645 (1912) (finding liability because the sale was made "with the purpose and intent" that the object be used for patent infringement), overruled on other grounds, *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 518, 37 S.Ct. 416, 61 L.Ed. 871 (1917).

A service is tailored to infringement if it is "not capable of 'substantial' or 'commercially significant' noninfringing uses." *Grokster*, 545 U.S., at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring) (quoting *Sony*, 464 U.S., at 442, 104 S.Ct. 774). In *Sony*, copyright owners sued the maker and the retailers of the Betamax video tape recorder. *Id.*, at 422, 104 S.Ct. 774. The tape recorder could be used to record copyrighted television programs for later personal viewing, which would not constitute infringement. *Id.*, at 449, 104 S.Ct. 774. On the other hand, it could also be used to reproduce and sell copyrighted television programming, which would constitute infringement. *Ibid.* The lower court found the Betamax maker liable because the tape recorder was "not suitable for any substantial noninfringing use" and infringement "was either the most conspicuous use or the major use of the Betamax product." *Id.*, at 428, 104 S.Ct. 774 (internal quotation marks omitted). This Court reversed, concluding that "[t]he Betamax is ... capable of substantial noninfringing **\*968** uses"—like personal use—so "sale of such equipment to the general public does not constitute contributory infringement." *Id.*, at 456, 104 S.Ct. 774.

These two forms of contributory infringement track patent law. See *Grokster*, 545 U.S., at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring). Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Such liability requires that the party express "an affirmative intent that the product be used to infringe." *Grokster*, 545 U.S., at 936, 125 S.Ct. 2764. Under § 271(c), a party is liable when it sells a product used for infringement "knowing the same to be especially made or especially adapted for use in an infringement of such patent."

This Court has repeatedly made clear that mere knowledge that a service will be used to infringe is insufficient to establish the required intent to infringe. In *Kalem Co.*, the Court explained that "mere indifferent supposition or knowledge on the part of the seller" that the buyer will use the product unlawfully is "not enough" to make the seller liable for the buyer's conduct. 222 U.S., at 62, 32 S.Ct. 20. In *Sony*, the Court explained that "[t]here is no precedent in the law of copyright" for liability based only "on the fact that [the defendant] has sold equipment with constructive knowledge of the fact that its customers may use that equipment to make unauthorized copies of copyrighted material." 464 U.S., at 439, 104 S.Ct. 774. And, in *Grokster*, the Court confirmed that "a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement." 545 U.S., at 939, n. 12, 125 S.Ct. 2764.

### III

Thus, Cox is not contributorily liable for the infringement of Sony's copyrights. Cox provided Internet service to its subscribers, but it did not intend for that service to be used to commit copyright infringement. Holding Cox liable merely for failing to terminate Internet service to infringing accounts would expand secondary copyright liability beyond our precedents.

Cox neither induced its users' infringement nor provided a service tailored to infringement. As for inducement, Cox did not "induce" or "encourage" its subscribers to infringe in any manner. *Id.*, at 930, 125 S.Ct. 2764. Sony provided no "evidence of express promotion, marketing, and intent to promote" infringement. *Id.*, at 926, 125 S.Ct. 2764. And, Cox repeatedly discouraged copyright infringement by sending warnings, suspending services, and terminating accounts. As for providing a service tailored to infringement, Cox's Internet service was clearly "capable of 'substantial' or 'commercially significant' noninfringing uses." *Id.*, at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring). Cox did not tailor its service to make copyright infringement easier. Cox simply provided Internet access, which is used for many purposes other than copyright infringement.

The Fourth Circuit found otherwise based only on its Circuit precedent establishing a new form of contributory liability. The court did not suggest that Cox induced its users to infringe. 93 F.4th at 235, n. 4. And, it did not deny that Cox's service was "capable of substantial lawful use and not designed to promote infringement." *Id.*, at 236. Rather, the court held that "supplying a product with knowledge that the recipient will use it to infringe copyrights is ... sufficient for contributory infringement." *Ibid.*; see also *BMG*, 881 F.3d at 311–312. The Fourth **\*969** Circuit's holding thus went beyond the two forms of liability recognized in *Grokster* and *Sony*. It also conflicted with this Court's repeated admonition that contributory liability cannot rest only on a provider's knowledge of infringement and insufficient action to prevent it. See *Kalem Co.*, 222 U.S., at 62, 32 S.Ct. 20; *Sony*, 464 U.S., at 439, 104 S.Ct. 774; *Grokster*, 545 U.S., at 939, n. 12, 125 S.Ct. 2764.

IV

Finally, Sony argues that the DMCA safe harbor would have no effect if Internet service providers are not liable for providing Internet service to known infringers. Brief for Respondents 38. The DMCA safe harbor protects Internet service providers that terminate repeat infringers "in appropriate circumstances." 17 U.S.C. § 512(i)(1)(A). Sony argues that Congress must have enacted the DMCA on the presumption that Internet service providers could be held liable in cases such as these.

Sony overreads the DMCA. Sony does not contend that the DMCA expressly imposes liability for Internet service providers who serve known infringers. It does not. The DMCA merely creates new *defenses* from liability for such providers. And, the DMCA made clear that failure to comply with the safe-harbor rules "shall not bear adversely upon ... a defense by the service provider that the service provider's conduct is not infringing." § 512(*l*).

V

The judgment of the Court of Appeals for the Fourth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOTOMAYOR, with whom Justice JACKSON joins, concurring in the judgment.
Cox Communications, an internet service provider, receives thousands of notices every day that specific Cox-supplied internet connections have been used to infringe copyrights. The Court granted certiorari to decide whether Cox can be held secondarily liable for copyright infringement committed by others on its network because Cox knowingly continues to service specific internet connections that have been, and will continue to be, used to commit that infringement.

The majority holds that Cox is not liable solely because its conduct does not fit within the two theories of secondary liability previously applied by this Court. In so doing, the majority, without any meaningful explanation, unnecessarily limits secondary liability even though this Court's precedents have left open the possibility that other common-law theories of such liability, like aiding and abetting, could apply in the copyright context. By ignoring those past decisions, the majority also upends the statutory incentive structure that Congress created.

I nonetheless agree with the majority that Cox cannot be held liable here for a different reason. Plaintiffs cannot prove that Cox had the requisite intent to aid copyright infringement for Cox to be liable on a common-law aiding-and-abetting theory. I therefore concur in the judgment.

## I

The Copyright Act does not expressly provide for secondary liability. See *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 434, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Still, this Court has recognized that there are two types of secondary liability under the Copyright Act: vicarious and contributory liability. **\*970** See *ibid.* The former attaches when a party has control over another's infringing activity and fails to stop it, and the latter attaches when a party materially contributes in some way to another's infringement. See *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005); see also *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (CA2 1971) (discussing vicarious and contributory liability). This case comes to the Court with only contributory liability remaining at issue.

As the majority explains, this Court's cases have held that contributory liability for copyright infringement may attach in at least two circumstances. The first is when a defendant distributes or provides a product or service that is incapable of "commercially significant noninfringing uses." *Sony*, 464 U.S., at 442, 104 S.Ct. 774. In other words, the product or service must be " 'good for nothing else' but infringement." *Grokster*, 545 U.S., at 932, 125 S.Ct. 2764. The Court applied that doctrine in *Sony*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574, and held that Sony was not liable for copyright infringement for selling the Betamax, a tape-recorder device that enabled users to record television shows for later watching. *Id.*, at 442, 104 S.Ct. 774. Regardless of whether the Betamax could be used to commit infringement, the Court reasoned, it was also capable of "commercially significant noninfringing uses," such as recording a show for personal viewing at home after it aired. *Ibid.*

The second circumstance in which contributory liability may attach is when a party induces another to commit infringement. The Court applied this rule in *Grokster,* 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781. There, the defendants distributed peer-to-peer file sharing software that had lawful uses but also enabled massive amounts of copyright infringement as users shared copyrighted materials with one another without authorization. *Id.*, at 919–922, 125 S.Ct. 2764. Drawing from the common law, the Court held that a party can be liable for the infringements of another if it takes " 'active steps ... to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use." *Id.*, at 936, 125 S.Ct. 2764 (citation omitted). The Court found that the software distributors had done just that by advertising their software to users of previous infringing services, declining to implement filters or other policies to weed out infringing content, and relying on a revenue model tied to high-volume use of their software. *Id.*, at 939–940, 125 S.Ct. 2764.

## II

I agree with the majority that neither of the two prior theories of secondary liability applied by this Court covers Cox's conduct. See *ante*, at 968 - 969. The majority is wrong, however, that those are or should be the only two forms of secondary liability for copyright infringement. The majority's artificial limiting of secondary liability is supported by neither precedent nor statute.

## A

To determine whether Cox may be held liable, the majority starts by correctly explaining that "[t]he provider of a service is contributorily liable for the user's infringement only if it intended that the provided service be used for infringement." *Ante*, at 962 - 963; see *infra*, at 972 - 976. The majority, however, errs in the very next sentence. It asserts, with no meaningful explanation, that "[t]he intent required for contributory liability can be **\*971** shown only if the party induced the infringement or the provided service is tailored to that infringement." *Ante*, at 967. Because plaintiffs do not satisfy those theories of contributory liability, according to the majority, their claims cannot succeed.

The inflexible limit the majority imposes is nowhere to be found in either *Sony* or *Grokster*, the only authorities that the majority cites, see *ante*, at 967. Beginning with *Sony*, although that case acknowledged that the Copyright Act does not expressly provide

for secondary liability, it also clarified that "[t]he absence of such express language in the copyright statute does not preclude the imposition of" secondary liability, such as vicarious and contributory liability, because both forms of liability are "imposed in virtually all areas of the law." 464 U.S., at 434–435, 104 S.Ct. 774; see *id.*, at 436, 104 S.Ct. 774 (Contributory liability principles are " 'recognized in every part of the law' "). Far from supporting the majority's limitation of secondary liability, *Sony* teaches that the scope of secondary liability for copyright infringement should be defined by reference to other areas of the law. *Id.*, at 435–437, 104 S.Ct. 774.

The Court reinforced this point in *Grokster*. In that case, the Ninth Circuit attempted to limit contributory liability to the circumstances *Sony* confronted. This Court reversed, explaining that *Sony* neither "displace[d] other theories of secondary liability" nor "foreclose[d] rules of fault-based liability derived from the common law." 545 U.S., at 934–935, 125 S.Ct. 2764. Instead, all *Sony* did was "limi[t] imputing culpable intent as a matter of law from the characteristics or uses of a distributed product." 545 U.S., at 934, 125 S.Ct. 2764. "[N]othing in *Sony*," the Court said, "requires courts to ignore evidence of intent if there is such evidence." *Ibid.*

Properly understood, *Sony* and *Grokster* preserved other forms of secondary liability derived from the common law. The majority, however, does not even mention that *Grokster* expressly held the door open to other common-law liability rules. Instead, all the majority offers is that it is "loath to expand [secondary] liability" further based on the general principle that "[o]rdinarily, when Congress intends to impose secondary liability, it does so expressly." *Ante*, at 967. That principle, however, is irrelevant here because this Court held over 40 years ago that the Copyright Act impliedly provides for secondary liability. See *Sony*, 464 U.S., at 434–435, 104 S.Ct. 774. *Stare decisis* requires this Court to apply that holding fairly, not ignore or artificially constrain it. Indeed, "*stare decisis* carries enhanced force when a decision ... interprets a statute." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 456, 135 S.Ct. 2401, 192 L.Ed.2d 463 (2015). Whatever the majority may think of *Sony* and *Grokster*, those decisions have "effectively become part of the [copyright] statutory scheme." *Kimble*, 576 U.S., at 456, 135 S.Ct. 2401. Whether that statutory scheme imposes liability under these circumstances must be decided according to what those cases said, not what the majority might wish they had said. Adhering to precedent is even more important where, as here, Congress has legislated based on this Court's decisions.

## B

The majority's limiting of secondary liability here dismantles the statutory incentive structure that Congress created. Congress passed the Digital Millennium Copyright Act (DMCA) in 1998, 14 years after this Court held in *Sony* that the Copyright Act impliedly provided for secondary liability. At the time, the internet was exploding in popularity. Without knowing more about the outer bounds of secondary liability for copyright infringement, **\*972** and faced with a rapidly changing technological landscape, Congress included in the DMCA a safe harbor that shields internet service providers (ISPs) like Cox from secondary liability for copyright infringement. To gain that protection, they must "adop[t] and reasonably implemen[t] ... a policy that provides for the termination in appropriate circumstances" of subscribers who repeatedly infringe copyrights using the ISP's network. 17 U.S.C. §§ 512(a) and (i)(1)(A). Importantly, Congress did not provide that ISPs could never be secondarily liable for copyright infringement. Instead, it struck a balance by creating incentives for ISPs to take reasonable steps to prevent copyright infringement on their networks, while also assuring ISPs that they do not need to take on the impossible task of responding to every instance of infringement on their networks.

The majority's new rule completely upends that balance and consigns the safe harbor provision to obsolescence. Typically, this Court tries " ' "to give effect, if possible, to every clause and word of a statute." ' " *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). After today, however, ISPs no longer face any realistic probability of secondary liability for copyright infringement, regardless of whether they take steps to address infringement on their networks and regardless of what they know about their users' activity. See Tr. of Oral Arg. 14 (counsel for Cox agreeing that it "would have no liability risk" based on knowledge alone). For example, under the majority's rule, an ISP faces no liability if it sells an internet connection to a company that the ISP knows runs a website that exclusively hosts illegally obtained copyrighted material. That ISP also faces

no liability even if it sells a connection to a customer who walks into the store and says that he needs a new internet connection because the other, more scrupulous ISP in town cut his connection after years of unabated piracy.

The majority's decision thus permits ISPs to sell an inter-net connection to every single infringer who wants one without fear of liability and without lifting a finger to prevent infringement. It also means that Cox is free to abandon its current policy of responding to copyright infringement. As Cox's counsel conceded at oral argument, under the rule the majority adopts today, the safe harbor provision will not "d[o] anything at all" going forward, *id.*, at 28–29. Congress did not enact the safe harbor just so that this Court could eviscerate it. [*]

III

Instead of artificially limiting secondary liability, the Court should have examined whether some other "rul[e] of fault-based liability derived from the common law" might hold Cox liable for copyright infringement committed on its network. *Grokster*, 545 U.S., at 934–935, 125 S.Ct. 2764. Plaintiffs argue that Cox is liable because it materially contributed to infringement by servicing internet connections that it knew would be used to commit infringement. That argument is rooted in the common-law doctrine of aiding and abetting. That doctrine, however, requires plaintiffs to show that Cox intended to aid infringement, and the facts of this case foreclose that inference.

**\*973**  A

This Court has addressed common-law civil aiding-and-abetting liability twice in recent years. In both cases, it held that aiding-and-betting liability requires proof that the defendant aided another with the intent of helping that other person succeed in committing wrongful conduct.

The first of this Court's recent cases is *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 143 S.Ct. 1206, 215 L.Ed.2d 444 (2023). There, the plaintiff alleged that social media platforms had aided and abetted a terrorist attack by ISIS because they knowingly hosted content, posted by ISIS and its followers, that was intended to spread ISIS propaganda, recruit members, and raise funds. *Id.*, at 481, 143 S.Ct. 1206. The platforms also allegedly promoted that content via their algorithms. *Ibid*. The plaintiffs asserted that the platforms had not done enough to "detect and remove a substantial number of ISIS-related accounts, posts, and videos." *Ibid*.

This Court held that the platforms could not be held liable as aiders and abettors based on the complaint's allegations. After surveying lower court cases and common-law sources, the Court identified the "conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participate[s]' in a wrongful act so as to help 'make it succeed.' " *Id.*, at 493, 143 S.Ct. 1206 (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949)). Put another way, "the defendant has to take some 'affirmative act' 'with the intent of facilitating the offense's commission.' " 598 U.S., at 490, 143 S.Ct. 1206 (quoting *Rosemond v. United States*, 572 U.S. 65, 71, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014)). The plaintiffs' claims did not plausibly meet this standard, however, because they failed to allege that pro-ISIS accounts or content received "any special treatment." 598 U.S., at 498, 143 S.Ct. 1206. Nor did they allege any other facts sufficient to overcome the "attenuated ... nexus" between the platforms' actions and the ISIS attack or establish that the platforms intended to aid that attack. *Id.*, at 506, 143 S.Ct. 1206.

Importantly, *Twitter* emphasized that "the concep[t] of aiding and abetting" does not "lend [itself] to crisp, bright-line distinctions," *ibid.*, but rather "should be understood in light of the common law," *id.*, at 497, 143 S.Ct. 1206. The common law, in turn, recognizes that intent can sometimes be inferred from what the defendant knew when he acted. The Second Restatement of Torts explains that this kind of knowledge-based intent can be found where "the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead." Restatement (Second) of Torts § 8A, Comment *b* (1963–1964). In these circumstances, the actor "is treated by the law as if he had in fact desired to produce the result." *Ibid*.

For example, someone who gives a gun to another, knowing with certainty that the other person will shoot someone with it, could be found to have intentionally aided a shooting even if he did not desire for anyone to be shot. If the recipient shoots someone with that gun, then under the common law, the person who gave the shooter the gun could be held liable for aiding and abetting the shooting. See *id*., § 876(b) and Comment *d* (1977); Restatement (Third) of Torts: Liability for Economic Harm § 28, Comment *c* (2018).

This theory of intent requires a sufficiently specific showing of knowledge. In *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 145 S.Ct. 1556, 221 L.Ed.2d 910 (2025), this Court rejected secondary liability for gun manufacturers whose guns were used by Mexican drug cartels to commit violence in **\*974** Mexico due to insufficient allegations of intent. *Id.*, at 291, 145 S.Ct. 1556. There, Mexico alleged that the gun manufacturers had aided and abetted the unlawful gun sales that routed guns to those cartels. *Id.*, at 287–289, 145 S.Ct. 1556. As the Court observed, there was "little doubt that, as the complaint asserts, some [unlawful] sales take place—and that the manufacturers know they do." *Id.*, at 294, 145 S.Ct. 1556. Nonetheless, applying the principles of aiding-and-abetting liability discussed in *Twitter*, the Court concluded that Mexico had not plausibly alleged that the gun manufacturers had " 'participate[d] in' " the illicit sale of guns to the cartels such that they sought " 'by [their] action to make' " those sales succeed. 605 U.S., at 294, 145 S.Ct. 1556 (second alteration in original). It observed that Mexico had "se[t] for itself a high bar" to clear because it did not "pinpoint, as most aiding-and-abetting claims do, any specific criminal transactions." *Ibid.* Instead, Mexico "level[ed] a more general accusation: that all the manufacturers assist some number of unidentified rogue gun dealers in making a host of firearm sales in violation of various legal bars." *Ibid.* The "systemic nature" of those more generalized allegations, the Court explained, required "plausible allegations of 'pervasive, systemic, and culpable assistance.' " *Ibid.* (quoting *Twitter*, 598 U.S., at 502, 143 S.Ct. 1206).

Mexico's allegations failed to clear that high bar. To start, Mexico did not allege that the gun manufacturers had treated unlawful actors any differently from lawful actors. 605 U.S., at 295, 145 S.Ct. 1556. Mexico also failed to account for the fact that gun manufacturers sold the guns to middlemen distributors, whom the manufacturers did not control, who then sold the guns to illicit dealers. *Id.*, at 295–296, 145 S.Ct. 1556. Even if the gun manufacturers knew everything the distributors did, the Court continued, Mexico failed to allege plausibly that the manufacturers knew, or even could learn, which dealers were selling guns to the cartels. *Id.*, at 296–297, 145 S.Ct. 1556. Without that knowledge, or further evidence of the manufacturers' intent, the Court held that Mexico's allegations did not satisfy the standards necessary to impose aiding and abetting on the manufacturers because those allegations did not plausibly show that they had participated in the unlawful sales to make them succeed. *Id.*, at 296–299, 145 S.Ct. 1556.

B

These principles of aiding-and-abetting liability and intent resolve this case. Plaintiffs must prove that Cox intended to aid, and therefore help make succeed, copyright infringement committed by those who use its network. To do so, plaintiffs point out that Cox, having received copyright-violation notices, knew that specific connections it services have been, and will continue to be, used to infringe copyrights. Because Cox nonetheless continued to service those connections, plaintiffs argue that the jury could have found that Cox intended to facilitate infringement committed using those connections.

This record, however, cannot support finding the necessary intent for aiding-and-abetting liability to attach. To begin, Cox is merely supplying internet service to its customers. Nothing about that conduct is inherently culpable: Most internet traffic is lawful, and supplying an internet connection is just as consistent with lawful purposes as it is with unlawful purposes. See *id.*, at 292, 145 S.Ct. 1556 ("[R]outine and general activity that happens on occasion to assist in a crime ... is unlikely to count as aiding and abetting").

Nor have plaintiffs shown that Cox intended to aid specific instances of infringement. **\*975** That is because, based on plaintiffs' evidence, Cox does not actually know that specific users will commit infringement using Cox's network. Cox supplies internet connections to a wide range of customers, ranging from single users all the way to smaller regional ISPs. When Cox receives a

copyright violation notice, however, the notice specifies only which connection was used to infringe, not who used it to commit infringement.

That informational gap is fatal here. As *Smith & Wesson* explained, aiding-and-abetting liability most commonly attaches where the defendant aided a specific instance of unlawful conduct. *Id.*, at 294, 145 S.Ct. 1556. Often, that requires the plaintiff to show that the defendant, at a minimum, knew who the "principals" in the alleged unlawful acts were. *Id.*, at 295–296, 145 S.Ct. 1556. Here, however, plaintiffs have not shown that Cox had specific knowledge of who committed the infringing conduct. Take, for example, a connection sold to a single-family home. Cox, after receiving three notices of copyright violations, would know only that that home's connection is substantially certain to be used again in the future to commit infringement. Yet Cox would have no knowledge (indeed, plaintiffs have not shown that Cox has any way of knowing) who within the household committed infringement. Nor, for that matter, have plaintiffs shown any way for Cox to know if the infringer was a neighbor who might have the Wi-Fi password. Without that knowledge, it is not reasonable to infer that Cox intended to aid infringement committed by another person just because it provided an internet connection to some unknown infringer.

This problem is even more glaring when it comes to connections that serve hundreds or thousands of users. For instance, Cox provides internet service to regional ISPs who in turn supply internet service to thousands of users. Given the numbers involved, it is hardly surprising that Cox has received many copyright-violation notices as to connections supplied to regional ISPs. Still, Cox does not know who among a regional ISP's thousands of customers is committing infringement, even if it knows that someone has infringed in the past and that someone will infringe in the future.

In this scenario, the regional ISP is akin to the middlemen in *Smith & Wesson*: Like the middlemen who purchased lawful firearms and then redirected them to a mix of lawful and unlawful dealers, the regional ISP is purchasing lawful internet service and redirecting it to a range of users, some of whom will use the service lawfully and some who will use it unlawfully. See *id.*, at 294–296, 145 S.Ct. 1556. Furthermore, just as the gun manufacturers in *Smith & Wesson* did not have control over the middlemen, Cox similarly does not have control over the regional ISP. *Id.*, at 295–296, 145 S.Ct. 1556. Given this degree of removal from the infringing activity and Cox's incomplete knowledge, Cox cannot be found to have intended to aid in any specific instance of infringement committed using the connection that Cox provides to the regional ISP. The same is true for connections Cox provides to university housing, hospitals, military bases, and other places that are likely to have many different users.

Without proof that Cox knew more about individual instances of infringement, and without evidence of "pervasive, systemic, and culpable assistance" needed to support a more generalized theory of liability, see *Twitter*, 598 U.S., at 502, 143 S.Ct. 1206, plaintiffs have at most shown that Cox was "indifferent" to infringement conducted via the connections it sells. *Id.*, at 500, 143 S.Ct. 1206. Mere indifference, however, is not enough for aiding and **\*976** abetting liability to attach. *Smith & Wesson*, 605 U.S., at 297, 145 S.Ct. 1556.

\* \* \*

The facts of this case do not establish the requisite intent needed to hold Cox liable for infringement that occurred on its network. Because the majority needlessly curtails secondary liability in a manner inconsistent with both precedent and statute, I concur only in the judgment.

**All Citations**

607 U.S. ----, 146 S.Ct. 959, 31 Fla. L. Weekly Fed. S 601

## Footnotes

\*　　The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

\*　　Cox could not invoke the DMCA safe-harbor defense based on its efforts to reduce infringement because an earlier decision had foreclosed that defense for the relevant period. 93 F.4th 222, 228 (CA4 2024) (citing *BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293, 301–305 (CA4 2018)).

\*　　Under the majority's view, ISPs could still face secondary liability if they design their service to facilitate infringement or if they promote their service as infringement friendly. The safe harbor, however, is not intended to help an ISP facing liability on either of those two theories because it requires that an anti-infringement policy be "reasonably implemented." 17 U.S.C. § 512(i)(1)(A).

---

**End of Document**　　　　　　　　　　　　　　　　　　　　© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# TAB B

2026 WL 922501
Only the Westlaw citation is currently available.
Supreme Court of the United States.

GRANDE COMMUNICATIONS NETWORKS

v.

UMG RECORDINGS, INC., et al.

24-967
|
April 6, 2026

Case below, 118 F.4th 697.

**Opinion**

 **\*1**  The petition for a writ of certiorari is granted. The judgment is vacated, and the case is remanded to the United States Court of Appeals for the Fifth Circuit for further consideration in light of *Cox Communications, Inc.* v. *Sony Music Entertainment*, 607 U. S. ___ (2026).

**All Citations**

--- S.Ct. ----, 2026 WL 922501 (Mem)

---

**End of Document**                                            © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---