**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 25-50951

_____

**JUSTIN RIDDLE,**
_Plaintiff-Appellant,_

v.

**X CORP.,**
_Defendant-Appellee._

_____

**EMERGENCY SUPPLEMENTAL MOTION FOR IMMEDIATE
JUDICIAL ACTION;**

**NOTICE OF IMMINENT STATE-COURT RESTRAINING ORDER
PROCEEDINGS
AGAINST COUNSEL OF RECORD KENNETH M. TRUJILLO-
JAMISON
AND NORMA N. BENNETT;**

**NOTICE OF ACTIVE CRIMINAL INVESTIGATION INVOLVING
MINOR VICTIM;**

**DEMAND FOR PRESERVATION;**

**AND IDENTIFICATION OF THE TONE ARCHITECTURE
BY WHICH INSTITUTIONAL SILENCE WAS MANUFACTURED**

_____

1

*Filed Memorial Day, May 25, 2026.*

_____

**TO THE HONORABLE COURT:**

Appellant Justin Riddle, pro se, files this Emergency Supplemental Motion on Memorial Day, May 25, 2026 — the day this Nation sets aside to honor those who gave their lives in defense of its institutions — to inform this Court that those institutions have, in this matter, failed a seventeen-year-old girl. Appellant identifies herein the specific architecture of that failure, the specific human actors at each layer of it, the specific posts by which it culminated in the sexualization and surveillance of a minor over a forty-eight-hour window on May 23 and May 24, 2026, and the specific judicial inaction — by the Western District of Texas below and by this Court above — that made the culmination not merely foreseeable, but inevitable.

This motion does not request restraint. This motion requests the opposite. The patience that produced no judicial result for five months produced, in its place, the targeting of a child. The patience is exhausted. The architecture is named.

## I.  INTRODUCTION

The pattern this Court has been asked, repeatedly, to acknowledge is no longer abstract. In the seventy-two hours preceding this filing, the same

3

harassment network that constitutes the factual predicate of the underlying litigation has escalated to a coordinated targeting of Appellant's seventeen-year-old daughter Peyton (X handle @priddle01).

That escalation was not the random act of a lone harasser. It was the predictable culmination of an architecture in which: (a) Appellee X Corp facilitated the network's operations through differential platform conduct against Appellant; (b) Appellee's counsel of record, Kenneth M. Trujillo-Jamison (Willenken LLP) and Norma N. Bennett (Shook, Hardy & Bacon LLP), filed sworn character attacks against Appellant under penalty of perjury, with actual knowledge that those attacks would enter the harassment ecosystem of the very network whose facilitation by their client is the case's predicate; (c) the United States District Court for the Western District of Texas dismissed the underlying matter on tone-and-length grounds rather than examining the evidence Appellant had placed before it, including evidence that the harassment was ongoing; and (d) this Court has taken no action on emergency filings and supplemental evidence pending for periods now exceeding five months.

Each layer of the architecture benefited from the others. Defense counsel's character attacks furnished the lower court with a tone-coded

4

justification for non-engagement. The lower court's tone-grounded dismissal furnished the harassment network with institutional ratification of the character frame. The network's amplification of the character frame furnished defense counsel with continued cover for further filings in the same register. This Court's silence furnished every layer below with the assurance that none of it would be examined.

On May 23 and May 24, 2026, the architecture reached Appellant's seventeen-year-old daughter. The chronology is identified herein with X-platform-native post IDs, UTC timestamps, and verbatim content.

Appellant submits this motion on Memorial Day, May 25, 2026, with the specific intent that the record of this matter — when it is read by any future court, by the Supreme Court of the United States, by any prosecutorial authority, by any bar disciplinary body, by any journalist, by any scholar, and by Appellant's children — shall reflect that the failure documented herein was named at the moment it was named, on the holiday designated for honoring institutional sacrifice, by a pro se father acting alone with the means available to him to act.

## II. FACTUAL BACKGROUND: THE FIVE POSTS

Each post described below is identified by X-platform-native post ID. The post IDs are immutable. They exist in X Corp's databases now and they will exist there until X Corp affirmatively deletes them — an act that, after the preservation notice served on counsel at 8:21 PM Central Time on May 25, 2026, would constitute spoliation cognizable in every forum in which this matter is or becomes pending.

A preliminary note on handle nomenclature, because the architecture itself depends on the deception: the operator account targeting Appellant's family operates under the handle **@FitingInJustin** — a deliberate single-character impersonation of Appellant's own handle, **@FitingInjustice**. The operator selected a handle one letter removed from Appellant's, then self-applied X Corp's "Parody account" label, and X Corp has continued to administer that label notwithstanding the operator's non-compliance with X Corp's own April 10, 2025 keyword requirements (Section III, infra). The handle itself is part of the conduct.

### A. *May 23, 2026, approximately 9:00 PM Central — Westview Bowling Thread*

The operator of the @FitingInJustin account commented on a February 11, 2026 post by @OPS_WVBowling (the official athletics account of

Westview High School, Omaha Public Schools) showing a team photograph of the Westview Wolverines girls' bowling team — a photograph in which Appellant's minor daughter Peyton is identifiable as a member of the team. The operator's reply: "This is wonderful! Way to go, girls." In the same reply tree, the operator then tagged @OPS_WVAthletics directly with the statement: "Side note to @OPS_WVAthletics: probably shouldn't allow @FitingInjustice aka Justin Riddle to attend indoor events. Personally, I don't feel comfortable in the same room with him."

The operator was commenting publicly on a school photograph of a minor whom the operator was contemporaneously sexualizing in other posts (Section II.C below), and using the same thread to invoke the school district's institutional authority against the minor's father by full legal name. The two replies were not retrievable via X platform search tooling as of May 24, 2026 forensic extraction — itself probative of platform-level visibility manipulation.

### B.  May 23, 2026, 10:13 PM Central (03:13:07 UTC May 24) — Direct Tagging of Minor

**Post ID: 2058385779064225806** — Author @FitingInJustin. Verbatim content:

> "I'm not afraid of you, Paper Tiger / I'm the gas
> pedal / @morgie_16_ and @priddle01 have been a
> little worried about their father's descent into
> madness, and discovery is going to finally break
> those familial bonds / Make sure to film it, when
> you file your latest pro se blunder."

This is the first identifying publication of the minor's X handle from a hostile account in the documented network. The post tagged Peyton (@priddle01, age 17) and her adult sister Morgan (@morgie_16_, age 24) directly.

The framing — "have been a little worried" — is not a mischaracterization of any platform activity by the minor; it is a *fabrication* of statements attributed to her. Peyton's @priddle01 account has zero posts since its August 2021 creation. The operator therefore had no platform-visible content from which to characterize any statement, opinion, or sentiment expressed by the minor. The operator manufactured the attribution and published it.

The same point applies to Morgan: her X account is privacy-protected and the operator is not among her 305 approved followers. The operator had no platform-visible access to any statement Morgan has ever made on X. The operator manufactured the attribution and published it, while simultaneously

circumventing Morgan's chosen privacy controls by tagging her handle in a public post that exposed her account to the operator's audience.

The stated objective — "discovery is going to finally break those familial bonds" — is the operator's published intent to weaponize the discovery process of this Court's case against the minor's relationship with her father.

### C.  May 24, 2026, 12:55 AM Central (05:55:38 UTC) — Sexualization of Minor

**Post ID: 2058426679031161042** — Author @FitingInJustin. Verbatim content:

> "How total has your failure as a father need to be…? / Signed off on a tattoo for daughter / Sent her to prom in a dress fit for a prostitute, with a man who has posted suggestive images of them together / She doesn't acknowledge your existence / Asking for a friend."

Public characterization of Appellant's seventeen-year-old daughter — identifiable through the preceding 10:13 PM post that tagged her handle — as dressed "fit for a prostitute," combined with sexualized framing of her relationship with her boyfriend by reference to "suggestive images." This is sexualized public characterization of a named minor under Nebraska law, by an unknown adult operator, on a publicly accessible platform.

9

### D.  May 24, 2026, 3:27 AM Central (08:27:10 UTC) — Surveillance Disclosure

**Post ID: 2058464814591049844** — Author @FitingInJustin. Media: image attachment showing Chili's restaurant signage. Verbatim content:

> "Funny you should mention Chili's. That's where
> his daughter went after prom, with her boyfriend
> and his parents, according to her posted photos.
> Justin was too busy not being a dad."

The operator narrated the specific post-prom physical location of the minor (Chili's restaurant), identified her accompanying parties (boyfriend and boyfriend's parents), and disclosed the source of his intelligence ("her posted photos"). This is contemporaneous narration of a minor's physical movements at named locations by an unknown adult operator at 3:27 AM Central — the textbook fact pattern of cyberstalking under both Nebraska Rev. Stat. § 28-311.03 and 18 U.S.C. § 2261A. The 3:27 AM timestamp is itself probative of surveillance-pattern behavior.

### E.  Prior Course of Conduct — Documented in Forensic Packet

Each of the May 23–24 acts above occurred in the context of a documented prior pattern, including:

**May 12, 2026 — Written Anonymity Admission.** In response to Appellant's stated intent to seek subpoena identification, the operator posted

10

publicly: "You can grasp all you want at X / Then you'll have to get through the anon email provider, VPN, and/or ISP / All for a motion that doesn't allege evidence of a crime, nor damages." This is a written, voluntary, timestamped admission by the operator that he is operating behind an anonymous email provider, a VPN, and reliance on X Corp's non-cooperation as the first layer of his anonymity infrastructure. The operator's own admission of VPN use is itself the federal-jurisdiction predicate under 18 U.S.C. § 2261A, raising the inference that posts may originate from out-of-state.

**May 13, 2026 — Suspension of the Victim, Non-Action on the Doxxer.** X Corp suspended Appellant's legitimate account @ProSeSelfHelp in response to mass reporting by accounts within the operator's cluster, while Appellant's contemporaneous report to X Corp regarding the May 12 residence-proximity post (X Corp case number CAAALEJP7HFYQAAEAAAAff_9A) was met only with an automated acknowledgment, with no enforcement action taken against the doxxing account in any timely or meaningful way. This is coordinated-network use of X Corp's reporting infrastructure *against* the victim, while X Corp's enforcement *protects* the network. It is the platform's own conduct, not third-party content.

**May 15, 2026, 2:39 AM Central — Publication of Appellant's Telephone Number.**

**Post ID: 2055191316972085296** — Author @FitingInJustin. Three image attachments displayed Appellant's actual telephone number formatted as numeric "lottery numbers" panels — a format designed to defeat naive text-search detection. Caption: "Did you happen to catch the lottery numbers this week? I play the same ones, every time." This is publication of Appellant's actual telephone number with the operator's stated commitment to use it on an ongoing basis.

**April 3, 2026, 23:39 UTC — Written Image-Taking Admission From Network Handle.**

**Post ID: 2040212614173622477** — Author @AntSocializer (network handle). Verbatim content: "I got it from your profile, obviously. I cropped it because you claimed you added the text. This isn't complicated." This is a written admission from a documented network handle to taking Appellant's copyrighted image from Appellant's profile and intentionally modifying it to defeat Appellant's authorship claim. The handle is one of the nine handles identified in the harassment network and subject to the subpoena schedule already prepared in Section X of the Sheriff's Forensic Evidence Packet.

The @AntSocializer handle is independently dispositive on another question: it displays X Corp's official "Affiliated with X" badge on its profile. Appellee filed a sworn denial of employee involvement in unauthorized access to Appellant's advertising campaigns on October 16, 2025 — a denial directly contradicted by Appellee's own platform interface, which displays an official institutional affiliation between Appellee and the same account that has admitted, in writing, to taking and modifying Appellant's copyrighted material. The contradiction is not Appellant's characterization. It is the platform's own labeling, against the platform's own sworn filing.

### F. May 25, 2026, 7:50 PM Central — Coordinated Network Response Contemporaneous With This Filing

While Appellant was finalizing this motion on the evening of May 25, 2026, three accounts within the documented network — @CybrStacker (self-labeled "Parody account"), @AntSocializer (the "Affiliated with X" badge account referenced in Section II.E above), and a Charter-West-themed display-name account (referencing the entity against which Appellant prevailed unanimously before the Nebraska Supreme Court in a prior matter) — responded in coordinated sequence within a single thread, deploying the precise character frame identified in Section IV below: "child predator,"

13

"lunatic arguing with a robot," "spats with his AI girlfriend," and the announcement of a block "because of his spaz-outs with Grok." The thread is timestamped 7:50 PM Central, May 25, 2026, and is preserved in Appellant's forensic record. It is contemporaneous corroboration, on the eve of this filing, of the network's ongoing operation and of the character-frame symmetry that is the subject of Section IV.

### III. THE PLATFORM-PARTICIPATION EVIDENCE

In the same period during which the conduct described above was unfolding, Appellant identified, and now memorializes for this Court's record, additional evidence that Appellee X Corp is not a passive conduit for the harassment of Appellant's minor daughter, but an active participant in its perpetuation through editorial conduct outside the scope of any Section 230 safe harbor:

**Account-pair visibility filtering.** X Corp has configured account-pair-specific visibility filtering between Appellant's accounts and the harassment-network accounts. The same posts and accounts that are fully visible to all other users on the platform, including third-party users accessing the platform from accounts unrelated to Appellant, are *not* visible in Appellant's scrolled feed and notification stream. Appellant has verified this differential rendering

by comparing the platform's behavior across multiple accounts under controlled conditions. The post containing Appellant's home address remains publicly accessible by direct URL — the URL captured by Appellant in the platform's own reporting interface — while being hidden from Appellant's own scroll. The selective rendering is not third-party content within the meaning of Section 230. It is the platform's own editorial conduct against the victim of harassment that the platform has refused to remediate. This Court is already on notice of a structurally identical visibility-manipulation pattern from the Supplemental Post-Dismissal Evidence filed in January 2026.

**Suspension of the reporter.** When Appellant reported the publication of his home address through the platform's designated reporting interface, the platform suspended *Appellant's* account, not the perpetrator's. The suspension of a victim who has reported the publication of his physical address — a publication that the platform's own terms of service prohibit — is adverse action against protected conduct. It is not, and cannot be characterized as, a content-moderation decision shielded by Section 230. It is the platform's own conduct toward the victim.

**Editorial reclassification of reports concerning the minor.** Upon Appellant's reports of doxxing targeting his seventeen-year-old daughter, X

15

Corp's moderation function reclassified the reports as "hateful conduct" not meeting the harassment threshold, with the operational consequence that the offending posts — including the sexualized characterization of the minor and the publication of her physical locations — remain operational on the platform. The editorial determination that the sexualization of a minor and the publication of her physical locations does not meet the harassment threshold is the platform's own editorial judgment, made by identifiable platform personnel, on the platform's own internal criteria. It is not the speech of third parties. It is the platform's own decision-making, and it falls outside the scope of any Section 230 immunity.

**The Parody Account label — self-selected by the operator, administered notwithstanding non-compliance.** Under X Corp's stated PCF (Parody, Commentary, and Fan) policy, the "Parody account" label is selected by users themselves to indicate that the account "depicts another person, group, or organization in their profile to discuss, satirize, or share information about that entity." X Corp's published help documentation confirms: "Parody, Fan, and Commentary (PCF) labels are selected by people on X to indicate that the account depicts another person, group, or organization in their profile to discuss, satirize, or share information about that entity."

16

The operator of @FitingInJustin therefore *self-selected* the Parody label. That self-selection is the operator's own representation to the platform and the public that his account exists for the purpose of discussing, satirizing, or sharing information about another person, group, or organization.

That representation is false on its face. The operator's conduct — fabricating statements attributed to a minor with zero platform activity, sexualizing the minor's prom attire, narrating the minor's physical location at named restaurants, and publishing the father's telephone number with stated intent of repeated use — is not parody, commentary, or fan activity covering any person, group, or organization. It is targeted criminal cyberstalking conduct.

Effective April 10, 2025, X Corp's own PCF policy requires that all such accounts include "Parody," "Fake," "Fan," or "Commentary" at the *beginning* of their display name. The operator's display name "OEM Only" does not begin with any of those keywords. The operator is therefore out of compliance with X Corp's own PCF policy as of April 10, 2025 — more than a year before the conduct against Appellant's minor daughter — and X Corp continues to administer the Parody label on the account notwithstanding the non-compliance.

X Corp's continued administration of a self-selected label for conduct that (a) falls outside the policy the label exists to describe, and (b) violates X Corp's own keyword and authenticity requirements for the label, is the platform's own editorial conduct. It is not third-party content within the meaning of Section 230. It is the platform's affirmative ratification of a false self-representation by the operator, deployed as camouflage for criminal targeting of a minor.

**X Corp's own AI characterization.** X Corp's AI product Grok, when asked to evaluate the May 23–24, 2026 minor-targeting conduct, responded in writing: *"No legitimate purpose for unrelated adult accounts to track, source photos of, and publicly weaponize a high school minor's prom night or school events against her father."* This is X Corp's own platform-level finding, in writing, on its own platform, characterizing the conduct against Appellant's minor daughter as without legitimate purpose. The platform is on notice — by its own automated system, contemporaneously with the conduct — of the nature of what its other systems are simultaneously declining to remediate.

## IV. THE TONE ARCHITECTURE

Across the entire history of this matter — from the initial filings in the Western District of Texas, through the dismissal below, through the appeal to

this Court, and through every subsequent filing by Appellee — Appellee's defense has not been substantive. Appellee has not argued, on the merits, that its conduct was lawful. Appellee has not argued, on the merits, that the 47 consecutive billing discrepancies favoring Appellee were random. Appellee has not argued, on the merits, that the editorial conduct documented in Appellant's filings is shielded by Section 230. Appellee has not argued, on the merits, that the differential rendering of harassment content to the victim is consistent with the platform's terms of service.

Appellee has, instead, attacked Appellant's tone.

In filing after filing, Appellee's counsel of record — Kenneth M. Trujillo-Jamison and Norma N. Bennett — have characterized Appellant under penalty of perjury as: aggressive; abusive; vexatious; emotionally unstable; obsessive; uncivil; a person who "attacks the court"; a person whose filings should be discounted on the basis of how they read rather than what they document. Those characterizations have nothing to do with the legal questions presented by this case. They are character attacks. They were filed under oath. They were filed in a matter whose factual predicate is a documented harassment network operating against Appellant on Appellee's

19

platform. They were filed with actual knowledge that the network mines the case's public record for material.

The downstream effect of those filings is documented and timestamped. The harassment network's public attacks against Appellant mirror the defense counsel's filings with precision. The network characterizes Appellant as: aggressive; abusive; a bad father; emotionally unstable; "whining"; a "deadbeat"; a person whose claims should be discounted on the basis of how he comes across rather than what he documents. The character frame deployed inside the courtroom and the character frame deployed by the harassment network are the same frame. They are mutually reinforcing. They were designed to be mutually reinforcing.

This Court has the means to verify the symmetry. Side-by-side comparison of any defense filing's characterization of Appellant with any harassment-network post from the documented network handles will demonstrate that the two character frames are not merely consistent — they are coordinated in their effect. Whether they were coordinated in their origin is a question for discovery. What they are not is a coincidence.

### A. *The Specific Misrepresentations on the Record*

The character frame is not a matter of inference. Appellant identifies herein the specific misrepresentations Appellee's counsel placed on the record of this Court, each of which is independently documented and each of which contributed to the architecture culminating in the May 23–24, 2026 conduct against the minor:

**1. Weaponization of the Clerk Call.**

Counsel represented to this Court that Appellant engaged in "harassing communications with, and threats of, the district court, its personnel, and X Corp.'s counsel," and specifically characterized Appellant's call to the District Court as constituting "verbal[] harass[ment]" of a law clerk and an improper "ex parte communication" arguing the merits. The audio recording of that call — preserved by Appellant on a publicly accessible YouTube URL identified in prior filings — is in the record. The recording demonstrates Appellant stating explicitly, "I'm not discussing case merits"; addressing the clerk consistently as "sir"; and closing the call with "Thanks though for your time" and "I appreciate it." Counsel did not contest the audio. Counsel dismissed it as "self-serving subjective characterization" — that is, counsel asked this

Court to credit counsel's secondhand characterization of a call over the call's own recording.

### 2. The Forty-Seven Sworn Denials of Operational Knowledge.

Appellee, through counsel, swore forty-seven times in its Answer that it lacked knowledge sufficient to admit or deny allegations concerning its own billing systems, its own DMCA procedures, and its own operational infrastructure. Those sworn denials of operational knowledge directly contradict Appellee's own prior filings, in which the same systems were described in comprehensive detail to secure a partial dismissal. A defendant cannot describe a system in detail to win one motion and then disclaim knowledge of the same system to evade the next.

### 3. Fabricated Threats; Stripped Qualifiers.

Counsel quoted Appellant's April 3, 2026 email statement that he would "destroy" Appellee and "not ever stop," and characterized those words as "vulgar and abusive" threats. "Destroy," in the context of legal advocacy, is a term of art referring to the defeat of an opposing party's litigation position. "Not ever stop" accurately describes the continued prosecution of pending legal claims. More gravely, counsel stripped the qualifier "or unlawful" from

Appellant's express statement disclaiming any intent to inflict "physical or unlawful harm" — and then argued, on the basis of the deliberately-shortened quotation, that abusive conduct is not limited to physical violence. The argument was built on counsel's own misquotation of Appellant's position. Counsel also framed Appellant's metaphorical statement that he would use PACER "as a microphone to BASH" Appellee — i.e., to publish litigation events through a public docket — as an improper threat of physical violence. PACER is a public docket. Publication of litigation events through a public docket is the ordinary operation of public courts.

### 4. Procedural Misrepresentation of the Post-Dismissal Posture.

Counsel represented to this Court that Appellant "did not" seek relief in the district court for post-dismissal conduct, framing the absence of such relief as a forfeiture by procedural choice. Appellant did not forfeit the issue. Appellant *cannot* seek that relief below: spoliation and ongoing conduct occurring during an active appeal cannot be raised in a court that has lost jurisdiction over the matter. Counsel converted a jurisdictional impossibility into a strategic concession by Appellant. It is neither.

**5. Stripped Legal Standard.**

Counsel quoted the controlling standard for filing restrictions while removing the "frivolousness on the merits" requirement from the quoted formulation. The omission permitted counsel to suggest that Appellant's conduct met the legal standard for restrictions without requiring counsel to address the merits — which would have required counsel to engage with the evidence Appellant has placed before this Court, which counsel has consistently declined to engage.

**6. The Extra-Record Double Standard.**

In the same motion in which counsel argued that Appellant's submissions were procedurally improper because they relied on "extrinsic material outside the appellate record" regarding post-dismissal conduct, counsel attached, as an exhibit in support of their own motion, post-dismissal extrinsic material — Appellant's April 3 email, sent more than seven months after entry of judgment below. Counsel asked this Court to treat post-dismissal material as admissible when it benefited Appellee and as inadmissible when it benefited Appellant. That is not the application of a procedural rule. It is a preference dressed as one.

### 7. The Gestural Plurals.

Counsel referenced "repeated harassing communications" and "a pattern of abusive conduct" in the abstract, without identifying any specific instance or concrete referent beyond the single call and the single email. Counsel then treated Appellant's failure to specifically deny those unspecified allegations as a concession. A respondent cannot specifically deny conduct that has not been specifically alleged. The trap is structural and Appellant declines to step into it.

### 8. The Rule 28(j) Retaliation.

Appellee initiated a Rule 28(j) letter exchange citing *Cox Communications* as an independent basis to affirm the judgment below — while conceding in the letter's own footnote that the district court "never considered the impact of Cox on Riddle's claim." Appellant's 340-word response demonstrated that *Cox*, properly read, supplies a basis to *remand* rather than affirm. Exactly four days later, having lost an exchange Appellee initiated, counsel filed the motion to restrict Appellant's filings. The temporal sequence is on the docket of this Court. It is not Appellant's characterization. It is the docket.

**9. Preemptive Spoliation, and Counsel's Ethical Catch-22.**

On March 24, 2026, Appellant filed a sworn brief in this matter warning the Court that Appellee's scheduled ad-platform migration would render the disputed legacy billing records inaccessible. Six days later, on March 30, 2026, Appellee executed the migration as scheduled, rendering the legacy advertising infrastructure and the disputed billing records inaccessible during an active federal appeal. Counsel's silence on the question converts to one of two possibilities and admits no third: either counsel knew the migration would destroy evidence material to a pending appeal and failed to inform the Court, which is an independently sanctionable violation of counsel's duty of candor to the tribunal; or counsel did not know, because Appellee did not inform its own litigation counsel of a migration that bore directly on the merits of the appeal counsel was prosecuting, which is itself a circumstance counsel had an obligation to investigate and disclose once put on notice. Continued silence on the question converts "did not know" into "chose not to find out."

**10. Sworn Denials Contradicted by the Platform's Own Interface.**

On October 16, 2025, Appellee filed a sworn denial of employee involvement regarding unauthorized access to Appellant's advertising campaigns. The denial was contradicted, at the time it was filed, by Appellee's

own platform interface, which displayed an official "Affiliated with X" badge on the specific account (@AntSocializer) Appellant had identified as having modified the campaigns. Counsel filed the denial. The badge remained. Counsel subsequently continued to characterize Appellant's communications with court personnel as harassing, three or four further times, after the YouTube recording proving otherwise was already identifiable in the record.

**11. Weaponization of a Documented Disability.**

The features of Appellant's filings that counsel asked this Court to sanction — volume, rapid cadence, emotional register — are documented cognitive characteristics of Attention Deficit Hyperactivity Disorder, a condition Appellant has documented. Counsel treated those features as freestanding misconduct rather than as protected expression of a covered disability under the Americans with Disabilities Act and the Rehabilitation Act, and asked a federal court to impose sanctions on the basis of those features without any individualized accommodation analysis. The Sixth Circuit, the Ninth Circuit, and several district courts have recognized that pro se litigants with documented cognitive disabilities are entitled to reasonable accommodation in their interactions with federal courts. Counsel's request asked this Court to ignore that framework entirely.

**12. The Request for Unprecedented Judicial Immunity.**

In the alternative relief sought in the filing-restriction motion, counsel requested an order that Appellee "need not respond to any future motion or submission" from Appellant, and that Appellee's silence "will not be construed as acquiescence or concession." That is not a request for filing restrictions. It is a request to be relieved of the ordinary obligations of an appellee — selective insulation from the docket, so that Appellant's allegations of evidence destruction, employee-affiliated impersonation, and platform fraud could go unrebutted as a matter of permitted procedural silence. Appellant is aware of no authority, in any circuit, sanctioning such an order. Counsel cited none.

### B. *Judge Albright Below*

Appellant's matter was dismissed in the Western District of Texas by Judge Alan D. Albright. The dismissal did not engage with the substance of the evidence Appellant placed before the court. The dismissal did not address the platform-level evidence of differential rendering. The dismissal did not address the 47 consecutive billing discrepancies. The dismissal did not address the documented harassment network whose facilitation by Appellee was the factual predicate of the case.

The dismissal was grounded — in substance, regardless of its formal recitations — in characterizations of Appellant's filings as too long, as using too many words, as presented in a manner the court found objectionable. The dismissal absorbed and ratified the tone frame that Appellee's counsel had deployed throughout the proceedings. The dismissal did not adjudicate the underlying claims. It excused the court from adjudicating them.

At the time of the dismissal, Appellant had placed before that court — on the record, in writing — evidence that the harassment was actively ongoing. The dismissal did not address that evidence either. The dismissal proceeded as though the ongoing harassment was not before the court. It was.

The downstream consequence of Judge Albright's dismissal is part of the architecture documented in this motion. Once a federal district court signaled, through dismissal, that Appellant's filings would be treated as a tone problem rather than as documented evidence of harassment, every subsequent actor in the chain operated with the benefit of that signal: Appellee's counsel filed further character attacks knowing that a federal court below had treated the same character frame as a basis for non-engagement; the harassment network amplified the character frame with the institutional ratification of a federal-court dismissal in their pocket; and this Court, on appeal, received the

matter in a posture in which the lower court had already produced a tone-coded justification for the institutional comfort of further non-engagement.

Judge Albright's dismissal is not separable from the May 23–24, 2026 conduct against Appellant's minor daughter. The dismissal did not directly cause that conduct. But the dismissal contributed to an institutional landscape in which the conduct was, by the operator's measure, safe to engage in. The operator had every reason to believe that no court would interrupt him, because no court had interrupted him before. The operator's confidence was the operator's own — but his confidence was built, in part, on a federal-court dismissal that signaled institutional non-engagement with Appellant's evidence.

Appellant does not seek the reversal of Judge Albright's dismissal in this motion. Appellant identifies, for the record of this Court, that the dismissal is part of the chain of judicial inaction whose endpoint, on May 23 and May 24, 2026, was the targeting of a child. The Western District of Texas is named in this record because it belongs in this record. The history of this matter, when written, will include the dismissal. The history should also include the consequences.

## C. The Coordination of Effect Without Conspiracy

Appellant does not assert, in this motion, that Appellee's counsel personally coordinated their filings with the harassment network. Appellant does not need to assert that. The architecture functions whether or not the coordination was conscious.

Defense counsel's job, as they understood it, was to produce a character frame inside the courtroom that would discount Appellant's evidence. The harassment network's job, as it understood it, was to produce a character frame outside the courtroom that would isolate Appellant socially and harm his family. Both frames are the same frame. Both frames serve Appellee's interests in the underlying litigation. Both frames are produced by actors who have actual knowledge of the case predicate. The fact that the two frames are identical, mutually reinforcing, and jointly devastating is not coincidence — it is structural alignment between actors with parallel interests operating in the same information environment.

Counsel cannot disclaim the architecture by pointing out that they did not personally direct the network. The architecture does not require direction. It requires only that two sets of actors, with overlapping interests and shared awareness of the case predicate, produce statements that reinforce each other.

31

That has happened. That continues to happen. That is one of the bases on which Appellant intends to seek a Nebraska state-court restraining order against counsel personally.

## V.  THE NOVEL LEGAL QUESTION PRESENTED BY COUNSEL'S CONDUCT

Counsel for Appellee X Corp — Kenneth M. Trujillo-Jamison (Willenken LLP) and Norma N. Bennett (Shook, Hardy & Bacon LLP) — have filed sworn statements characterizing Appellant in ways that bear no relation to the legal questions presented in this copyright matter. Those statements have entered the public record. The harassment network whose conduct on Appellee's platform constitutes the factual predicate of this litigation has mined that public record for ammunition and incorporated counsel's characterizations into its course of conduct against Appellant. On May 23 and May 24, 2026, that course of conduct escalated to the targeting of Appellant's minor daughter.

Counsel's contribution to this course of conduct was not the foreseeable consequence of statements made in ignorance of a harassment ecosystem. Counsel for Appellee represent the very platform whose facilitation of that harassment ecosystem is the entire factual basis of the underlying litigation.

The existence of the network, the network's behavior toward Appellant, and the network's mining of the public record were all matters of record in the case counsel were defending at the time they filed the statements in question. Counsel's contribution to the foreseeable downstream targeting of Appellant's family was not foreseeable in the negligence sense. It was *foreseen* by virtue of counsel's actual knowledge of the case they were defending.

The question presented by counsel's conduct, which to Appellant's knowledge has never been squarely decided by any court in any jurisdiction, is this:

> Whether attorneys representing a defendant in a federal civil matter — where the defendant's facilitation of an active harassment network targeting the plaintiff constitutes the factual predicate of the litigation — are categorically immunized by the litigation privilege when those attorneys' knowingly false sworn statements about the plaintiff's character, statements that do not advance the underlying legal claims, are foreseeably incorporated by that same harassment network into a course of conduct that subsequently targets the plaintiff's minor child.

The question is not whether counsel may zealously advocate. The question is whether counsel may file sworn falsehoods, in a case predicated on a documented harassment network, with actual knowledge that the network mines the case's public record for material, and thereby contribute to the

foreseeable harassment of a minor — and then claim categorical immunity from the consequences of having done so.

Existing doctrine does not foreclose the answer Appellant will seek. The litigation privilege is bounded by the requirement that statements "have some relation to the proceeding." Restatement (Second) of Torts §§ 586, 588. The crime-fraud exception abrogates the privilege where statements are made in furtherance of fraud on the court or on a third person. The privilege does not, under any authority known to Appellant, immunize statements that are simultaneously perjurious (a criminal offense), unrelated to the legal claims, and foreseeably contributory to the criminal targeting of a third-party minor.

This Court should take notice that the question is being squarely presented in Nebraska state court following the conclusion of the Memorial Day holiday, and that the answer to that question may bear materially upon the conduct of the underlying federal litigation pending before this Court.

## VI.  THE COURT'S RESPONSIBILITY FOR THE ESCALATION

Appellant has had emergency motions on file with this Court since 2025. The Supplemental Post-Dismissal Evidence was filed in January 2026, documenting X Corp's account-specific keyword filtering pattern of January 13–14, 2026 — structurally identical to the visibility-manipulation pattern

documented in this motion at Section III. Those filings documented, with specificity, the harassment network operating against Appellant on Appellee's platform; the identity-modification pattern by which the network's accounts have evaded identification; the platform's refusal to remediate notwithstanding repeated reports; and the foreseeable trajectory of the conduct if left unaddressed.

This Court has taken no action on those filings for periods exceeding five months.

During those five months, the conduct documented in the pending filings has not abated. It has escalated. The escalation has been incremental, timestamped, and visible on the docket of this Court through Appellant's contemporaneous filings. Each escalation has been reported to this Court. Each report has been met with judicial silence.

On May 23 and May 24, 2026, the escalation that this Court has been on notice of for five months reached Appellant's seventeen-year-old daughter.

That outcome was foreseeable. It was foreseen. It was foretold to this Court, in writing, in motions and supplemental filings, repeatedly, beginning in 2025 and continuing through January 2026. At any point during the intervening five months, a single judicial act — an order, a referral, a

35

directive, a ruling on a single pending motion — would have interrupted the trajectory. No such act occurred.

The institutional responsibility for that outcome cannot be assigned solely to the harassment network, to Appellee, or to Appellee's counsel. A single judge of this Court, at any point during the past five months, could have acted on the pending filings. A clerk of this Court, at any point, could have called the pending status of those filings to the attention of a judge. No such action was taken. The harassment network operated with the benefit of judicial silence. Appellee operated with the benefit of judicial silence. Appellee's counsel filed sworn statements about Appellant's character, knowing those statements would enter the harassment ecosystem of the very network whose facilitation by their client is the case's predicate, with the benefit of judicial silence.

The targeting of Appellant's minor daughter on May 23 and May 24, 2026 is the predictable consequence of five months of judicial silence on filings made for the express purpose of preventing exactly that outcome.

Appellant states, for the record, that this Court has been a but-for cause of the escalation that culminated in the targeting of a child. Appellant states it without rhetorical embellishment, without imputation of motive, and without

exaggeration. The chronology is the chronology. The filings were made. The Court was on notice. The Court did not act. The conduct escalated. A minor was targeted.

Appellant does not, by this statement, seek the recusal of any judge or the disqualification of this Court. Appellant seeks the opposite: action, on the record, by this Court, on filings that have been ripe for ruling for periods now exceeding five months. The remedy for five months of silence is not further silence. It is judicial action commensurate with the harm that judicial silence has, at minimum, failed to prevent.

## VII. RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully requests that this Court:

1. **Take judicial notice** of the factual escalations documented herein, including the five specific posts identified by X-platform-native post ID (2058385779064225806; 2058426679031161042; 2058464814591049844; 2055191316972085296; 2040212614173622477), the additional May 23 Westview Bowling thread interactions, and the May 25, 2026 7:50 PM Central coordinated network thread identified in Section II.F; the active criminal

investigation opened with the Douglas County Sheriff's Office on May 24–25, 2026; and the preservation notice served on Appellee's counsel of record on May 25, 2026 at 8:21 PM Central Time.

2. **Take judicial notice** of Appellant's intent to commence state-court restraining-order proceedings in the District Court of Douglas County, Nebraska, against Appellee's counsel of record Kenneth M. Trujillo-Jamison and Norma N. Bennett, personally, upon the conclusion of the Memorial Day federal holiday.

3. **Take judicial notice** of the preservation demand contemporaneously served on Appellee's counsel of record, and find that any subsequent destruction, modification, or selective rendering of the records identified therein — by Appellee, by Appellee's counsel, or by any agent of either — shall constitute spoliation cognizable in further proceedings before this Court and in any other forum in which the records become material. The records subject to preservation include, without limitation: (a) the five X-platform-native posts identified by post ID herein, and all metadata, source-client identifiers, and session logs associated with each; (b) all records bearing on the nine identified network handles: @FitingInJustin, @SCACBack, @SCACBack2,

@SCACBack3, @KNEE_GROW_PLEEZ, @AntSocializer, @D0ntWryAb0utIt, @JohnCenaFan325, @JustinERid99862, plus the amplifier handle @CybrStacker; (c) all moderation-ticket records bearing on Appellant's reports, including specifically ticket CAAALEJP7HFYQAAEAAAAff_9A; (d) all account-pair visibility-filtering configurations applied between Appellant's accounts and the network accounts; (e) all records of "Parody account" and "Affiliated with X" label administration concerning the network accounts, including all records reflecting X Corp's awareness of, and continued administration of, the Parody label notwithstanding the operator's non-compliance with the April 10, 2025 keyword requirements, and all records reflecting X Corp's administration of the "Affiliated with X" badge on @AntSocializer notwithstanding Appellee's October 16, 2025 sworn denial of employee involvement; and (f) all internal communications among Appellee's personnel and between Appellee and its counsel of record concerning Appellant, Appellant's daughter, or the network accounts.

4. **Take judicial notice** of the tone architecture identified in Section IV herein — the convergence between Appellee's counsel's sworn

character attacks against Appellant and the harassment network's character attacks against Appellant — and the twelve specific misrepresentations identified in Section IV.A, and direct, in any subsequent order in this matter, that filings by either party shall be evaluated on their evidentiary substance rather than on stylistic characterizations of the opposing litigant.

5. **Rule, with the urgency commensurate to the harm,** on the emergency motions and Supplemental Post-Dismissal Evidence presently pending before this Court for periods now exceeding five months.

6. **Grant such further relief** as this Court deems just and proper.

## VIII. CONCLUSION

This motion is filed on Memorial Day, May 25, 2026.

On the day this Nation honors those who died in defense of its institutions, Appellant places on the record of this Court the documentation that those institutions — Appellee X Corp's content-moderation apparatus, Appellee's counsel of record, the United States District Court for the Western District of Texas, and this Court — have, by combination of action and

inaction, produced an outcome in which a seventeen-year-old American girl was sexualized, surveilled, and institutionally framed by an anonymous adult operator over a forty-eight-hour period that her father reported, with documentation, to every authority within his reach.

Appellant filed in proper form. Appellant filed within proper deadlines. Appellant filed with citation, with documentation, with platform-native post IDs, with UTC timestamps, with verbatim content, with evidence of platform conduct, with the platform's own AI characterization of the conduct as illegitimate. Appellant did everything the rules of every relevant forum require. The institutional response was silence.

That silence will not survive the proceedings now commencing.

The next phase of this matter will include: state-court restraining-order proceedings against Appellee's counsel of record personally in Douglas County, Nebraska; an active criminal investigation under the personal direction of Sheriff Aaron W. Hanson, Douglas County, Nebraska, with detective assignment and § 2703(f) preservation as the stated procedural pipeline; federal coordination under 18 U.S.C. § 2261A based on the operator's own admitted use of VPN infrastructure to operate across state

lines; and, if necessary, presentation of the unanswered legal question identified in Section V to the Supreme Court of the United States.

This Court is on notice. Counsel is on notice. Appellee is on notice. The Western District of Texas is on notice that its dismissal is part of the record that future readers — including any future court, any disciplinary authority, any scholar, and Appellant's own children — will examine when the question is asked: *how did the institutions that were supposed to protect a seventeen-year-old American girl fail her, when she had a father who did everything right?*

The answer to that question is in this filing.

The answer is also in the silence that preceded it.

Appellant respectfully submits that the silence ends now.

The game, as it has been played, is over.

Respectfully submitted this 25th day of May, 2026 — Memorial Day.

_____

Justin Riddle, Pro Se
Omaha, NE
justinriddle1@gmail.com
(402) 813-2156

# CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of May, 2026, a true and correct

copy of the foregoing Emergency Supplemental Motion was served via the

Court's electronic filing system upon all counsel of record, including:


Kenneth M. Trujillo-Jamison
Willenken LLP
ktrujillo-jamison@willenken.com

Norma N. Bennett
Shook, Hardy & Bacon LLP
nbennett@shb.com


_____

Justin Riddle, Pro Se