**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

**No. 25-50951**

---

JUSTIN RIDDLE,

*Plaintiff-Appellant,*

v.

X CORP.,

*Defendant-Appellee.*

---

**SUPPLEMENTAL STATEMENT OF THE RECORD: ON WHAT FIVE MONTHS OF INACTION HAS PRODUCED, AND WHY THE DISPOSITION OF THIS APPEAL IS NO LONGER THE OPERATIVE QUESTION**

---

**TO THE HONORABLE COURT:**

There is a version of this filing that asks for something. This is not that filing.

Appellant has, across the life of this matter, asked. He asked the district court to read the evidence. He asked this Court to rule on motions ripe for periods now exceeding five months. He asked, in proper form, within proper deadlines, with citation and exhibit and timestamp, more times and more carefully than the rules of any forum require. The asking is concluded. This filing exists to record what the asking produced — and what the silence that met it has since produced — so that the record is complete regardless of what this Court elects to do with it.

Appellant will be direct about why this particular filing exists, and why now. It exists because while this matter sits, the conduct underlying it has not paused to wait for a ruling. It has escalated. And the escalation has reached his children.

## I.  WHAT THIS CASE ACTUALLY WAS, FROM THE FIRST DAY

It is necessary to restate what this case has always been, because the procedural history has worked to obscure it.

This was never an abstract copyright dispute over a stock photograph. The work at issue is a federally registered image of Appellant's own face. It was taken and deployed by an actor who used it, together with Appellant's name, his likeness,

his documented Nebraska Supreme Court victory, his published writing, and his personal backstory, to **impersonate Appellant** — to pose as him on the platform operated by Appellee. Appellee was notified. Appellee refused to remove it.

That impersonation did not stand alone. It shielded an underlying fraud that the record establishes through Appellee's own data — data reflecting not contested interpretation but conditions that cannot occur in honest accounting. Advertising campaigns showed completion rates exceeding one hundred percent against zero delivery. Cumulative impression counters traveled *backward* — decreasing over time, a movement that does not exist in the linear flow of measurement. Campaigns marked rejected nonetheless accrued metrics and charges. These are not allegations requiring expert reconciliation. They are arithmetic and physical impossibilities, visible on the face of Appellee's own records.

That is the matter that came before the district court. Not a question requiring delicate adjudication. A registered copyright in a man's own face, a stranger openly wearing that face to impersonate him, and a fraud documented by impossibilities in the defendant's own numbers. On the face of that record, the wrong is not ambiguous, and it does not become ambiguous through repetition. A court shown a valid federal registration, a documented impersonation operating in real time, and metrics that violate arithmetic does not require months to perceive

that something is wrong and that the impersonation should at minimum be paused while the matter is adjudicated.

That pause never came. The district court sat. The months accumulated. And the impersonation — having met no interruption from any court — did what unaddressed conduct of this kind does. It grew.

## II.  WHAT THE INACTION GREW INTO

Appellant states the following not as a separate grievance but as the direct, traceable consequence of the inaction described above. The two are not severable. The second exists because the first was permitted.

The conduct against Appellant did not begin recently, and it did not begin with the accounts most visible today. It traces back to 2023, through a succession of accounts — earlier "dubz" variants, and an account operating as **@JustinERid99862** that used Appellant's actual name and Appellant's federally copyrighted photograph, together with a photograph of Appellant's wife, to pose as Appellant directly. That account did not merely impersonate; it inverted. While wearing Appellant's face and reciting Appellant's own documented history — including the bank Appellant had sued and beaten — it publicly accused Appellant's genuine account of being the impostor. The impersonation was self-proving: an account reciting facts true only of Appellant, while displaying

4

Appellant's photograph, identifies itself as the counterfeit by the very content it published. This was before the lower court. It could not have been clearer.

From there the conduct escalated along a documented progression of accounts, each cycling into the next, each ramping the aggression and widening the target: **@AntSocializer → @JohnCenaFan325 → @D0ntWryAb0utIt → @SCACBack → @FitingInJustin → @EnigmaHomeLLC.** This is not a list of unrelated strangers. It is the behavioral signature of a sustained, single-purpose campaign cycling through identities across years — a progression that begins by impersonating Appellant and ends by acquiring Appellant's family and his business identity as its targets.

The endpoint of that progression is dispositive of its character. The final account, **@EnigmaHomeLLC**, took the name of Appellant's own company — Enigma Holdings — and now rotates, every few days, images of Appellant's family and images taken from inside Appellant's home, including a current banner photograph of the interior of Appellant's closet and a profile image of Appellant's adult daughter. Its biography reads "wE'Re aBoUt to fiND oUt." The account carries Appellee's self-selected, platform-administered "Parody account" label. There is no person, brand, or institution being satirized. It is an account wearing Appellant's business name and displaying Appellant's family's photographs and the interior of his home, and Appellee administers a "parody" designation that

legitimizes it. The "fiND oUt" is not commentary. It is a stated intention of continued escalation, published in the account's own description, beneath a label the platform supplied.

This is also the answer to the question Appellant is most often asked: why not simply stop using the platform, or ignore it. To ignore conduct is to deliberately decline to watch for an attack that may be coming. But this conduct is not directed at Appellant from a distance he can turn away from. It is conducted as Appellant — using his face, his name, and his company's identity, against his own family, naming his children's locations. A person cannot look away from an impersonation of himself, because looking away does not end the impersonation; it only blinds the person to what is being done in his name. This is not a platform Appellant can walk away from. It is an identity he is being forced to monitor, because someone else is wearing it, and has been for three years.

And the escalation reached a child. On May 23 and May 24, 2026, the same campaign targeted Appellant's seventeen-year-old daughter — a minor. The conduct against the minor is documented by platform-native post identifiers, timestamps, and verbatim content already placed before this Court. It includes the public sexualization of a named, identifiable minor; the fabrication of statements attributed to a minor who has never posted on the platform; and the narration of the minor's physical location at a named restaurant at 3:27 in the morning, sourced

from her movements. That conduct meets the statutory definition of cyberstalking. It is being committed against a child.

Appellant anticipates the response that the targeting of his daughter is a matter separate from the questions presented in this appeal. It is not separate. It is downstream. The impersonation that this Court and the court below were asked, repeatedly, to interrupt was the seed. Five months of institutional silence was the soil. The cyberstalking of a minor is what grew. No court ordered the conduct against the child, and Appellant alleges none did. But the conduct against the child became possible — became, to the actors committing it, safe — precisely because every prior wrong in this matter was permitted to stand unaddressed. A network that has watched a federal court decline to act on open impersonation for months has been given every reason to believe it will not be interrupted, because it has not been interrupted.

That is the cost of the sitting. It is no longer measured in delay. It is measured in a child.

### III.  THE PLATFORM'S OWN RECORDS

Appellant directs this Court to evidence that is not his characterization and cannot be recast as third-party content: Appellee's own internal advertising history log.

That log — generated by Appellee's own systems, displayed in Appellee's own interface — identifies the accounts **@Ryanmh_X** and **@AntSocializer** in the "Modified by" field of Appellant's own advertising campaigns. These accounts were interacting with Appellant's promotional content. Appellant did not know either account existed until he found them in his own advertising logs, modifying his campaigns. He had blocked neither. He had no reason to — he had never encountered them.

When Appellant located the @AntSocializer account, he discovered that the account had blocked *him*. That direction matters. A block initiated by that account against Appellant is an act of concealment — it walls the account off from Appellant's view so that Appellant cannot see what the account is doing or saying. Yet the platform's own logs show that same concealed account reaching into Appellant's advertising campaigns and modifying them. The result is an asymmetry that only the platform can create: the account is hidden from Appellant, while retaining platform-granted access to manipulate Appellant's account from the other side of the wall. Appellant cannot see them; they can reach him. That is not the speech of a third party. It is the platform's own conduct, recorded in the platform's own logs, against the person the platform's controls were supposed to protect.

The nature of that manipulation is itself significant. The conduct documented in Appellant's filings below — which Appellee never denied on its merits — describes campaigns whose real expenditure was routed, or "sandboxed," into non-human bot traffic while the advertiser was shown fabricated metrics indicating genuine delivery. Infrastructure capable of diverting a specific advertiser's spend to bots while generating false delivery figures for that advertiser does not arise by accident. It requires multiple coordinated, purpose-built components, and the record reflects that it was operating before Appellant was ever individually targeted. The very complexity Appellee's counsel has repeatedly cited as the basis for objecting to Appellant's page length is the complexity of the scheme Appellant is describing. A multi-component fraud requires a multi-component explanation. The length is a function of what was built, not of how Appellant chose to write.

The @AntSocializer account is independently significant on a second ground. It displays Appellee's official "Affiliated with X" badge. On October 16, 2025, Appellee filed a sworn denial of employee involvement in unauthorized access to Appellant's advertising campaigns. That denial is contradicted by Appellee's own interface, which displays an institutional affiliation between Appellee and the very account its own logs show modifying Appellant's

campaigns. The contradiction is not Appellant's. It is the platform's own labeling, set against the platform's own sworn filing.

These facts dispose of the defense Appellee has leaned on throughout: that it is a neutral conduit, a pipeline, a medium that merely carries what others post and therefore bears no responsibility for it. That characterization may have described a platform fifteen years ago. It does not describe the conduct documented here. A neutral pipeline does not configure visibility so that the same harassment content is hidden from the target while remaining fully visible to every other user. A neutral pipeline does not suspend the person who reports abuse while leaving the abuse in place. A neutral pipeline does not administer a "parody" designation onto an account wearing a man's company name and his children's faces. A neutral pipeline does not grant a concealed account access to reach into another user's advertising campaigns. Each of these is a choice about who sees what — which is the definition of an editorial act — and each was executed by systems the platform built and controls.

Appellant anticipates the rejoinder that the algorithm, not the platform, produces these outcomes. The rejoinder defeats itself. The platform wrote the algorithm. An outcome produced by a system its author designed, deployed, and profits from is not an event that happened to the platform; it is an act the platform performed through an instrument of its own making. "The algorithm did it" is a

statement that the platform's own hands did it. And the tell that this is not error but design is the direction of the outcomes: across the entire history of this matter, the abusive content directed at Appellant has been displayed and the abusive content has been protected, while Appellant's reports have been disregarded and Appellant's own account suspended. Error is random; it would occasionally fall the other way. These outcomes have never once fallen the other way. A result that breaks in the same direction without exception is not the product of a system getting it wrong. It is the product of a system doing exactly what it was configured to do.

## IV.  THE OBSCENITY ON THE RECORD

Appellant now directs this Court to the specific juxtaposition that this filing is compelled to memorialize, because it will not be unwritten once it is written.

Appellant submitted to this Court a filing that documented the foregoing in full — the impersonation, the platform's refusal, the escalation, and the targeting of his minor daughter, with the post identifiers and timestamps to substantiate every claim. This Court's operative response to that submission was to deny it, and to deny the accompanying request, on the ground that the filing exceeded the applicable word count.

11

Appellant asks this Court to sit with the plain meaning of that sequence, stated without ornament:

**A federal court of appeals, presented with documented evidence that a seventeen-year-old girl is being sexualized and stalked on a platform as the downstream consequence of conduct that court was asked for months to interrupt, identified the operative problem as the number of words the child's father used to report it.**

That is the record. Appellant did not construct it. He is only the first to state it in language plain enough that it cannot be mistaken. Between the documented cyberstalking of a minor and the page length of the document reporting it, the latter was treated as the matter requiring the Court's corrective attention. There is no reading of that sequence that reflects well on the institution that produced it, and Appellant does not offer one, because none exists.

## V.  THIS COURT HAS BEEN SHOWN WHERE THIS ENDS

Appellant anticipates that the conduct described here will be treated as novel — an unusual dispute, perhaps overstated, not the sort of thing that ordinarily requires a court to intervene against a platform. It is not novel. The federal courts have been shown this precise sequence before, more than once, and they have watched it reach its conclusion. Appellant offers the following not as legal

authority binding this Court, but as proof that the trajectory is known — that the destination of platform-enabled identity harassment, left unaddressed, is a matter of documented record and not of Appellant's speculation.

A man was targeted on this same platform by coordinated actors who deployed his personal data and identity until the campaign culminated in a swatting raid at his home and his death. The platform functioned as the orchestration hub for the campaign that killed him. The corporate entity was nonetheless granted immunity. The lesson on the record is that identity-based harassment left unaddressed on this platform has already produced a body.

A sixteen-year-old boy was relentlessly targeted by anonymous users on a platform that explicitly marketed a zero-tolerance safety policy and promised to unmask abusers. After the boy died, the platform ignored his mother's direct pleas. In May 2026 — weeks ago — a federal district court dismissed the claims, ruling that the platform's explicit safety guarantees were mere "puffery" rather than binding commitments. That is the legal architecture that permits a platform, and a court, to look at a parent reporting the cyberstalking of a minor and treat the report as legally weightless. It was applied to a dead child this spring.

A man was impersonated through more than a thousand fraudulent profiles that broadcast his real home and work addresses and directed strangers to his physical location. He notified the platform on the order of one hundred times. He

obtained a state-court restraining order. The platform ignored all of it, asserting a technical "inability" to stop the perpetrator — while holding the patents on the very location technology being weaponized against him. The court granted immunity, reasoning that the platform's product-design failures were inextricably linked to content it could not be compelled to moderate.

Appellant asks this Court to hold these records alongside its own. In each, a platform was shown a known, dangerous, identity-based campaign and declined to act. In each, the conduct escalated. In each, the human cost was borne by the target while the institution retreated behind doctrine. The courts that decided those cases were not unaware of where the conduct was heading; the conduct had already arrived there. And yet the pattern was permitted to stand, and the doctrine was extended to shield it.

That is the context in which this Court received a father's documented report that the same kind of campaign had reached his seventeen-year-old daughter — and identified, as the operative problem, the length of the document reporting it. This Court has been shown where this ends. It cannot claim the trajectory is unknown. It has been written into the federal record, in case after case, in bodies.

And Appellant will say the quiet part plainly, because it is the truest part: Appellant has survived this trajectory for three years because of particular and unusual capacities — the documentation, the persistence, the refusal to be worn

down. Most people targeted this way do not have those capacities. The sixteen-year-old did not. The next person will not. A system that functions only for those equipped to survive it is not functioning. It is selecting. And the selection is made by the institutions that decide whether to pull the brake or to ask about word counts.

## VI.  THE SELECTIVE CLOCK

The word-count denial does not survive contact with this Court's own timeline, and the contrast is itself part of what this filing records.

When presented with mathematical proof of fraud and documented harassment, this matter sat for periods exceeding one hundred eighty days without action. But when the occasion was procedural — enforcing a page limit, or disposing of a question in Appellee's favor — the machinery moved with dispatch. Evidence destruction occurring during an active appeal was addressed, and effectively set aside, within days. A word-count objection was issued and acted upon. The institution that could not find time across half a year to address arithmetic impossibilities and the stalking of a minor found time, promptly, for housekeeping that operated to Appellant's disadvantage.

Speed, it turns out, was always available. It was simply reserved for the matters that did not require the Court to engage the substance. A rule applied with

urgency in one direction and indefinite patience in the other is not a neutral rule. It is a selectively deployed instrument, and its selective deployment is documented on this Court's own docket by the dates alone.

The same selectivity governed what this Court was willing to tolerate from the opposing party. Appellee was permitted to demonstrate comprehensive, detailed operational knowledge of its own systems when doing so served a motion to dismiss — and then permitted, in its Answer, to disclaim knowledge of those same systems on the order of forty-seven separate occasions, including professing inability to confirm whether an account bearing its own institutional affiliation belonged to its own personnel. Detailed command of the facts when command served the defense; professed ignorance when ignorance served the defense. The objection to Appellant's word count was raised by the same process that accepted that.

## VII.  WHY "TOO MANY WORDS" WAS NEVER THE PROBLEM

Appellant addresses the word-count rationale on its own terms, because it does not survive examination.

The premise of a word limit, as a corrective, is that the reader understands the matter and the writer has simply been inefficient. That premise does not fit this record. Appellant has placed the core of this matter before these courts repeatedly,

across many months, in filing after filing. If the wrong — a registered copyright in a man's face, worn by an impersonator the platform refused to remove, shielding a fraud documented by impossibilities in the platform's own numbers, now metastasized into the stalking of his child — has not been understood after all of that, the deficiency is not one of length. One does not cure a failure of comprehension by supplying fewer words. If the volume of explanation provided to date has not produced understanding, a shorter explanation will not produce it either.

Which exposes what the word-count objection actually is. It is not a finding that the matter was over-explained. It is a procedural costume worn over a decision not to engage the matter at all — because to engage it on its substance would require acting on it, and acting on it is the one thing that has not happened at any point in this matter's history. "Too long" is how non-engagement is made to look like housekeeping. Appellant declines to accept the costume as the thing it is dressed as. The problem was never that he said too much. The problem is that the saying, however much of it there has been, has been met with a determination not to hear it.

## VIII.  THE MECHANISM, NOT THE MEN

Appellant names no individual in this statement, and the omission is deliberate. To name names would invite this Court, and any later reader, to treat this as a grievance — the complaint of one man against other men, resolvable by deciding whether those particular men behaved badly. That framing would be a mercy to the thing Appellant is describing, and the thing does not deserve it. What Appellant is describing is not a man. It is a mechanism, and the mechanism is legible because it repeats.

It repeated when a financial institution altered a document, an oversight body declined to look, and a court dismissed the consequence on a technical ground that never reached the alteration. It repeated when a public body withheld what the law required, a state legal office supplied the cover, and the judiciary protected the arrangement with rulings that contradicted themselves on their face — including a dismissal of a single matter, in a single order, for both a lack of jurisdiction and a failure to state a claim, two findings that cannot both be true of the same case at once. And it has repeated here, across federal jurisdictional lines, where a corporation facing mathematical proof of fraud disclaimed knowledge of its own systems, saw the evidence of those systems rendered inaccessible during an active appeal, and received the benefit of a disposition grounded in Appellant's conduct rather than its own.

The same five movements appear each time, in order: force the individual to proceed alone; construct a procedural impossibility; punish the individual for naming the impossibility out loud; render the evidence inaccessible; and dispose of the matter on the basis of the individual's reaction to the abuse rather than its substance. This Court does not require a probability computation to recognize what the recurrence means. The same five-stage sequence, in the same order, executed by unrelated actors who do not know one another, across separate state and federal jurisdictions, over a span exceeding seven years, is not a series of coincidences. Coincidence ceased to be an available explanation several iterations ago. What remains is a method — and the word-count denial described above is simply that method's most recent instance, non-engagement performed as procedure.

## IX. THE SHARED INSTRUMENT, AND WHAT APPELLEE HAS DONE TO THIS COURT

Appellant directs this Court's attention to a feature of this matter that the Court may not have had occasion to consider from this angle: the platform and the courts that have declined to address its conduct rely on the same instrument, and that instrument is power imbalance.

Appellee's strategy toward Appellant has been, throughout, a strategy of asymmetry, and the instrument is not patience — it is removal. The platform does

not need to wait for the user to exhaust. It can simply suspend him. When Appellant reports that someone is posting his home address, his telephone number, and information about his children, the platform's response is to suspend Appellant. Appellant's original account was suspended for reporting one of the harassing accounts; the account from which he now operates is his second; and as of this filing, that legitimate account stands suspended as well, while the impersonating and harassing accounts remain active. Reporting abuse to the platform is, in substance, the filing of a complaint — and the platform disposes of the complaint by removing the complainant. The judicial version of the same strategy is procedurally distinct but functionally identical: the court does not need to wear the litigant down either. It can simply dismiss — for lack of jurisdiction, for failure to state a claim, for exceeding a page limit — and be done. The platform removes by suspension. The court removes by dismissal. The mechanism — dispose of the person rather than engage the substance — is the same mechanism. And the sequence is identical in both forums: first an attempt to stop the matter, then an attempt to draw it out, and finally simple removal. A court that dismisses a litigant on the manner of his filings while declining to examine a platform that suspended that same litigant for reporting the abuse against his own children is not standing apart from the technique. It is enforcing it.

But Appellant raises this for a further reason, and it is one that ought to concern this Court independently of anything Appellant wants. Appellee has, through its own conduct, placed this Court in a position Appellant himself never could.

For a decade, across matters against a bank, a public school district, a state agency, and now a platform, Appellant has reached the merits of his claims exactly once. That single occasion was the unanimous decision in his favor by the Nebraska Supreme Court — and it was also the only occasion on which his evidence was placed before an audience, argued in public, before a room of some one hundred fifty law students at a Creighton University proceeding. The merits, the one time they were seen, prevailed completely. Behind closed doors, the same claims had been, and have since been, disposed of without ever being reached. Appellant does not offer this as a complaint about losing; he offers it as the identification of a variable. The single determinant of whether his evidence is engaged or discarded is whether anyone outside the institution is watching. Reached the merits once in a decade, only under public view, and vindicated — that record does not describe a litigant who cannot win. It describes a system that processes his claims in private and cannot afford to process them in public, because before an actual audience — a jury, a packed room — the conduct cannot be hidden. The trap is the closed door. And so the disparity held everywhere the door

stayed closed; the institutions could not be moved out of public view. And then Appellee — not Appellant — moved one. Appellee had every opportunity to make this matter disappear quietly: to remove an impersonator wearing Appellant's face, to address conduct its own systems documented, to resolve a dispute over a registered copyright before it metastasized. Appellee declined, repeatedly, out of the same institutional certainty that disparity would carry the day. And in declining, Appellee allowed the conduct to escalate until it reached a minor child — and in doing so, it attached this Court's inaction to the cyberstalking of that child.

That is a remarkable thing for a defendant to have done to a tribunal. Appellee has spent this Court's institutional credibility to spare itself the minor expense of removing an impersonator. Appellee's intransigence has forced the judicial system into a posture Appellant spent ten years unable to force it into: a posture in which silence is no longer neutral, in which inaction is now load-bearing in a record concerning harm to a child. Appellant could compel the system to engage only once, and only in public. Appellee, through arrogance alone, has now compelled it to choose — because the one option no longer available to this Court is the option of having its silence mean nothing. Appellee took that option off the table. Appellant did not. If this Court finds itself in an uncomfortable position, the party that put it there is the party whose conduct this appeal concerns.

There is a final detail that completes this point, and it is purely factual. The word-count barrier that met Appellant's last filing was not raised by Appellee. No party objected to the length. The Court's own intake process flagged the filing, and the Court then denied Appellant's motion for leave to exceed the limit on its own determination — and it did so quickly. Quickly enough, in fact, that Appellee never needed to lodge the objection Appellee has lodged repeatedly before: the objection to Appellant's length and tone, which has been the defendant's consistent instrument throughout this litigation. The Court supplied, on its own initiative, the very disposition the defendant would otherwise have requested, before the defendant had occasion to request it. That is the shared instrument at its most complete. It is not two institutions independently reaching for the same tool; it is a court deploying that tool on the defendant's behalf, unprompted, faster than the defendant could deploy it itself. And that is the predictable terminus of the position Appellee's own conduct has forced upon this Court: a defendant so accustomed to disposition-by-tone, in a system so accustomed to providing it, that the court now performs the maneuver before the party who benefits from it can even ask.

## X.  THE BURDEN HAS MOVED

If this Court can refute the documented record on its merits — if the arithmetic is honest after all, if the backward-traveling impression counters are an

artifact rather than an impossibility, if the impersonation was properly left in place, if the destroyed records were immaterial, if the conduct against the minor is not what the timestamps show it to be — then this Court should do so, on the record, and Appellant will stand corrected on the record, without complaint. That outcome would be welcome. It has simply never once occurred, in any forum, across the entire history described here.

To be precise about what refutation would have to overcome: Appellant identified the specific accounts modifying his campaigns. Appellee denied employee involvement on October 16, 2025. The activity logs bearing on those accounts were then subjected to erasure during the pendency of this appeal — and the issue was treated as moot shortly thereafter. The inaction was not passive. It supplied the precise interval in which the evidence became unavailable. A court asked to find that record immaterial must explain the sequence, not merely decline to examine it.

If this Court cannot refute the record on its merits, then every remaining avenue of disposition — dismissal on procedural grounds, dismissal grounded in Appellant's tone or character, a further objection to length, or silence — confirms rather than refutes the substance of this statement. A court that disposes of documented serious misconduct by reference to the manner or the word count of the person reporting it has not closed the matter. It has entered the record as a

further instance of the very thing the matter describes. Appellant states this without heat and without disrespect, as a matter of structure. The burden has moved. It now rests with the Court to demonstrate, on the merits, that Appellant is wrong. Anything else is itself an answer, and the answer will be preserved.

## XI. WHY THE OUTCOME OF THIS APPEAL NO LONGER GOVERNS

Appellant states plainly, so the record is unambiguous: the disposition of this appeal will not end this matter, because this matter was never contained within this appeal.

The facts documented here are not the property of this case. They travel. They are already prepared for filing in the courts of the State of Nebraska, where the conduct continues and where the record will continue to grow. And they do not travel as a single claim that one ruling could extinguish. The conduct at issue never stopped — it is ongoing, it has crossed from Appellant to his family to a minor child, and in doing so it has generated distinct and independently actionable wrongs across more than one body of law and more than one jurisdiction. That is not a litigation posture Appellant engineered through cleverness. It is the direct result of the conduct being permitted to continue unaddressed: a wrong that is never interrupted does not stay a single wrong. It renews, and it multiplies, and it does so on fronts that no disposition of this appeal can reach. An adverse ruling

here therefore removes nothing, resolves nothing, and exhausts nothing. The single instrument by which a litigant is ordinarily worn down — the power of a court to make the outcome of a given proceeding matter — is, in this instance, unavailable, because the substance has already placed itself beyond the reach of any single outcome.

This is not defiance. It is the accurate description of a position Appellant constructed deliberately, over years, so that this sentence would be true when the time came to write it. The record is the remedy. It always was. The ink in this Court is permanent, which is the only reason this Court is the venue. The audience is not the panel. The audience is every person who reads this afterward and asks how it was permitted to go this far — and who will find, on the record, that it was documented at the time, in plain language, by the person it was happening to and by the father of the children it reached; and that the institutions with the power to interrupt it identified, as their concern, the length of the document that told them so.

Appellant is under no illusion about how a filing of this kind is received. Members of the bench and bar communicate across jurisdictions as a matter of course; a document that describes an institution's conduct plainly does not travel to the next forum as a recommendation. Appellant files it anyway, and asks this Court to mark the reason, because the reason is the whole of it: the premise that

Appellant's standing before any court should turn on whether that court finds him agreeable is the precise error this entire record documents. It was never supposed to be about whether the institution liked him. It was supposed to be about the law. A court that disposes of documented, uncontested evidence because the litigant who presented it has become inconvenient is making the same move, by the same mechanism, that this filing describes — and if that move is repeated in the forum that comes next, it will have been predicted here, in writing, in advance. Appellant predicts it not by clairvoyance but by pattern: the playbook is singular, it has been run against him repeatedly across a bank, a school district, a state agency, a platform, more than one state court, and the federal courts, and it is so exhausted that what remains of it is the management of word counts and tone. Reached on the merits exactly once in a decade, in public, and vindicated; disposed of without reaching the merits everywhere the door was closed; the same conduct recurring across unrelated institutions and across jurisdictional lines — that is a record uniquely suited to the only question that ultimately matters, which is whether a self-represented litigant holding documented and uncontested proof is entitled to have the merits of his claims reached at all, or whether an institution's preference not to reach them is permitted to be the final word. That question is not the property of any single case. It is a dozen matters wrapped into one, and it is going to be asked.

# XII. CONCLUSION

Appellant does not ask this Court to be moved. Appellant asks this Court only to understand what it is now holding, and to understand that Appellant understands it too.

The wrong was plain from the first day. The numbers were impossible on their face. The inaction was a choice. The escalation was its consequence. The consequence reached a child. And the recorded response to the reporting of it was an objection to its length.

The conduct is documented. The chain of causation is traceable. The platform's own records contradict the platform's own sworn filings. The burden has shifted. The outcome does not govern. And this record will outlast every ruling that touches it.

Respectfully submitted,

/s/ Justin Riddle

_____

Justin Riddle, Pro Se

16422 Patrick Avenue

Omaha, Nebraska 68116

justinriddle1@gmail.com

(402) 813-2156

# CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June, 2026, a true and correct copy of the foregoing Supplemental Statement of the Record was served via the Court's electronic filing system upon all counsel of record, including:

Kenneth M. Trujillo-Jamison

Willenken LLP

ktrujillo-jamison@willenken.com


Norma N. Bennett

Shook, Hardy & Bacon LLP

nbennett@shb.com


/s/ Justin Riddle

_____

Justin Riddle, Pro Se